249 F.2d 915
 Mary MARTINEZ, Appellant,
v.
The SOUTHERN UTE TRIBE OF the SOUTHERN UTE RESERVATION, a corporation; and Samuel Burch, Julius Cloud, Virgil Red, Bonny Kent, John Baker and Sunshine C. Smith, as the Members of the Council of the Southern Ute Tribe of the Southern Ute Reservation, Appellees.
 No. 5650.
 United States Court of Appeals Tenth Circuit.
 November 15, 1957.
 Rehearing Denied December 17, 1957.
 
 Bentley M. McMullin, Denver, Colo. (Lewis M. Perkins and Howell W. Cobb, Durango, Colo., were with him on the brief), for appellant.
 LaVerne H. McKelvey and R. Franklin McKelvey, Durango, Colo., for appellees.
 Before MURRAH, PICKETT and LEWIS, Circuit Judges.
 LEWIS, Circuit Judge.
 
 
 1
 Alleging that she is entitled to but has been denied membership and the benefits of membership in the defendant corporation, plaintiff seeks to adjudicate her claims through complaint lodged with the United States District Court for the District of Colorado. 151 F.Supp. 476. Named as defendants are the Southern Ute Tribe of the Southern Ute Reservation, a federal corporation organized and chartered in accordance with 25 U.S.C.A. § 476, and the individuals comprising the governing body or Council of the corporate defendant.[1] The action was dismissed by the trial court as not involving a substantial federal question under 28 U.S.C.A. § 1331. There being no contention that jurisdiction otherwise exists, the single question is presented on appeal: Does plaintiff's complaint state a claim arising under and so requiring the interpretation or construction of the Constitution, laws or treaties of the United States?
 
 
 2
 Plaintiff is the legitimate daughter of one Juan (John) Green, who is a full-blood Indian and member of the Southern Ute Tribe of the Southern Ute Reservation. Although plaintiff's mother was not an Indian, plaintiff was accepted and recognized as a member of the tribe and was enrolled as a member under the provisions of 25 U.S.C.A. § 163. The tribe by vote accepted the provisions of 25 U.S.C.A. §§ 476 and 477 and organized into a membership corporation; its constitution and by-laws were approved November 4, 1936, and it received its charter as a federal corporation. After the incorporation, plaintiff continued to be recognized as a member until the year 1950.
 
 
 3
 Upon its incorporation, the defendant corporation succeeded to the ownership of all of the property of the tribe and, after its incorporation, acquired additional property. It is alleged that the corporation now controls the reservation and receives from other properties income of great value.
 
 
 4
 In about 1950, plaintiff was excluded from the reservation and denied the rights and privileges of a member of the tribe, including education for her children, medical care, and participation pro rata in the income of the tribe by the members of the Council. She asserts this alleged wrong to be attributable to the tribal corporation and its Council and subject to redress under federal judicial jurisdiction.
 
 
 5
 The federal courts are courts of limited jurisdiction and can take cognizance of only those matters which Congress has entrusted to them by statute. In the absence of a federal statute they do not have jurisdiction merely because an Indian who is a ward of the government is a party, Deere v. St. Lawrence River Power Co., 2 Cir., 32 F.2d 550, affirming Deere v. State of New York, D. C., 22 F.2d 851, or because property or contracts of Indians are involved, Kennedy v. Public Works Administration, D. C.N.Y., 23 F.Supp. 771; Button v. Snyder, D.C.N.Y., 7 F.Supp. 597.
 
 
 6
 Because of distinctions between the tribes, differences in treaties separately negotiated, and social and economic changes of the country, responsibility for Indian legal administration has rested variously with the tribal courts, the federal courts, and the state courts. Recognizing the sovereign, though dependent, nature of a tribal organization, Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483; United States v. U. S. Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894, Congress was slow to impose restrictions upon those governments in the management of their internal affairs. The tribal courts had exclusive jurisdiction over suits between members of the tribes and over crimes committed by Indians against Indians, Talton v. Mayes, 163 U.S. 376, 16 S.Ct. 986, 41 L. Ed. 196; Nofire v. U. S., 164 U.S. 657, 17 S.Ct. 212, 41 L.Ed. 588; Cornells v. Shannon, 8 Cir., 63 F. 305.
 
 
 7
 By Act of March 3, 1885 (now 18 U.S. C.A. § 3242) Congress provided for the trial and punishment of Indians committing any of ten major enumerated crimes within the Indian country in accordance with the extension of general laws of the United States concerning crimes committed in places of exclusive United States jurisdiction, Act June 30, 1834 (now 18 U.S.C.A. § 1152). Other offenses committed by one Indian against another on an Indian reservation are not punishable under the laws of the United States in the absence of specific statutory reference to Indians, but are to be dealt with in accordance with tribal customs and law. United States v. Quiver, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196. See 18 U.S.C.A. § 1152. More recently certain states have been specifically granted jurisdiction over offenses committed by or against Indians on Indian reservations, e. g. 25 U.S.C.A. § 232, 18 U.S.C.A. § 3243.
 
 
 8
 A similar pattern of piecemeal legislation has developed the jurisdiction of the different courts in civil actions concerning Indians, their rights and property. The doctrine that Indian affairs are subject to control of the federal, rather than state government, arises from the constitutional powers of Congress to make treaties, to regulate commerce with the Indian tribes, to admit new states, and to administer the property of the United States and legislation enacted in pursuance of these powers. The states of Arizona, Montana, New Mexico, North Dakota, Oklahoma, South Dakota, Utah and Washington were admitted to the union under enabling acts expressly disclaiming jurisdiction over Indian affairs and this provision was consequently written into their constitutions.
 
 
 9
 In accordance with these powers, Congress has enacted and repealed a welter of laws dealing with the protection of Indians beginning with the four Indian Acts of the First Congress in 1789. Significant legislation which in modified form continues in the law today has been concerned generally with the regulation of trade with the Indians, the sale of Indian lands, and the protection of those lands against trespass;[2] providing for the Bureau of Indian Affairs;[3] the punishment of crimes committed in Indian territory;[4] authorizing payment of moneys due tribes to individuals rather than tribal officers[5] (this in effect, substituted the judgment of federal officials for that of tribal governments on the question of tribal membership for disposition of funds); recognizing the right of Indians to punish their own offenders;[6] providing for federal criminal punishment for Indians committing certain offenses;[7] regulation of allotments;[8] a trusteeship of Indian moneys for the benefit of the tribe;[9] education of Indian children;[10] administrative powers in the Commission and Secretary of Interior concerning leases of Indian lands, and administration of estates of allotees;[11] citizenship;[12] prohibiting further allotment of Indian lands and providing for the maintenance of tribal integrity through incorporation.[13]
 
 
 10
 The 1934 extensive legislation, 25 U.S. C.A. § 461 et seq., had for its purpose the protection of Indian resources needed for tribal existence. It was under these sections that the Southern Ute Tribe was organized.
 
 
 11
 A further attempt to give reservation Indians equal protection of the laws of the state wherein they reside in accordance with the rights afforded other citizens of that state was made in Public Law 280, August 15, 1953, c. 505, 67 Stat. 588, 28 U.S.C.A. § 1360, wherein jurisdiction of the states of California, Minnesota, Nebraska, Oregon, and Wisconsin over criminal and civil causes within Indian territory was recognized. Tribal customs and ordinances not in conflict with state law were preserved. The Act further gave consent of the United States for those states inhibited by their enabling acts and constitutions to pass amendments providing for the assumption of jurisdiction over civil and criminal causes concerning Indian affairs.
 
 
 12
 In reporting the bill the Indian Affairs Subcommittee of the House Committee on Interior and Insular Affairs stated:
 
 
 13
 "As a practical matter, the enforcement of law and order among the Indians in the Indian country has been left largely to the Indian groups themselves. In many States, tribes are not adequately organized to perform that function; consequently, there has been created a hiatus in law-enforcement authority that could best be remedied by conferring criminal jurisdiction on States indicating an ability and willingness to accept such responsibility.
 
 
 14
 "Similarly, the Indians of several States have reached a stage of acculturation and development that makes desirable extension of State civil jurisdiction to the Indian country within their borders. Permitting the State courts to adjudicate civil controversies arising on Indian reservations, and to extend to those reservations the substantive civil laws of the respective States insofar as those laws are of general application to private persons or private property, is deemed desirable." 2 1953 U.S. Code Cong. & Adm. News, p. 2409.
 
 
 15
 It is interesting to note that in those states which clearly have jurisdiction by reason of statute, tribal laws not inconsistent with state law have been preserved. Further, the Bureau of Indian Affairs has provided for intra-tribal courts and a reservation code for the enforcement of law in those tribes "in which traditional agencies for the enforcement of tribal law and customs have broken down for which no adequate substitute has been provided under Federal or State law." 25 CFR 161 et seq.
 
 
 16
 Congress has retained jurisdiction in the federal district courts to "determine any action, suit, or proceeding * * * involving the right of any person * * * of Indian blood * * * to any allotment of land under any law of treaty" where the claimant is the plaintiff and the United States the defendant. 25 U.S.C.A. § 345.
 
 
 17
 It is clear that Congress at no time intended to provide for federal supervision of private civil actions by Indians. It is equally clear that the Due Process clause of the Fifth Amendment does not apply to the activities of the tribe or corporation for, although the Interior Department has ruled that for certain purposes Indian tribes are to be regarded as agencies of the federal government (Op.Sol.I.D.,M.29156, June 30, 1937; Op.Sol.I.D.,M.27810, December 13, 1934), the doctrine that an Indian tribe is not a federal instrumentality within the various statutory and constitutional restrictions upon federal instrumentalities has not been changed since it was laid down in Talton v. Mayes, supra.
 
 
 18
 Plaintiff argues, ignoring the purpose of the 1934 Acts to retain the tribal organization through incorporation, that because the corporation is organized under the laws of the United States membership rights are inherently a federal question. Although originally incorporation under federal law was sufficient to invoke the jurisdiction of the federal courts as raising a federal question, see 14 A.L.R.2d 1017, such an interpretation was effectively curtailed by the enactment of 28 U.S.C.A. § 1349:
 
 
 19
 "The district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock."
 
 
 20
 Plaintiff cites a number of the sections of the 1934 Reorganization Acts, the interpretation of which she claims is necessary to the disposition of her complaint. We see no such legal necessity.
 
 
 21
 Section 476 provides that any Indian tribe residing on the same reservation shall have the right to organize for its common welfare, and may adopt an appropriate constitution and by-laws, to be ratified by voting tribal members and approved by the Secretary of the Interior. This section also provides that, "In addition to all powers vested in any Indian tribe * * * by existing law", the tribe or its tribal council should also have certain additional powers with respect to protection of tribal lands.
 
 
 22
 Section 477 authorizes the issuance by the Secretary of the Interior of a charter of incorporation, to become effective only upon ratification by a majority vote of the adult Indians living on the reservation. And, Section 479, defines "Indian" as used in the preceding sections to include "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction and all persons who are descendants of such members * * * and all other persons of one-half or more Indian blood."
 
 
 23
 There is nothing in the text or context of these acts which purports to grant a member of the Ute Tribe membership in the corporation. Indeed, the purpose and tenor of the legislation was to make the power of self-government more effectual.
 
 
 24
 Nor can it be said that by excluding plaintiff's participation in the corporation that the tribe or the Council have usurped powers granted to or reserved to a federal agency.
 
 25 U.S.C.A. § 163 provides:
 
 25
 "The Secretary of the Interior is authorized, wherever in his discretion such action would be for the best interest of the Indians to cause a final roll to be made of the membership of any Indian tribe; such rolls shall contain the ages and quantum of Indian blood, and when approved by the said Secretary are declared to constitute the legal membership of the respective tribes for the purpose of segregating the tribal funds as provided in the preceding section, and shall be conclusive both as to ages and quantum of Indian blood: Provided, That the foregoing shall not apply to the Five Civilized Tribes or to the Osage Tribe of Indians, or to the Chippewa Indians of Minnesota, or the Menominee Indians of Wisconsin." (Emphasis added.)
 
 
 26
 Article II of the Constitution & Bylaws of the Tribe is:
 
 
 27
 "Membership
 
 
 28
 "Section 1. The membership of the Southern Ute Tribe of the Southern Ute Reservation shall consist of the following:
 
 
 29
 "(a) All persons duly enrolled on the 1935 census of the Southern Ute Reservation: Provided, That rights of participation shall depend upon the establishment of legal residence upon the reservation;
 
 
 30
 "(b) All children of members, if such children shall be of ½ or more degree of Ute Indian blood.
 
 
 31
 "Section 2. The Council shall have power to pass ordinances, subject to the approval of the Secretary of the Interior, covering the adoption of new members.
 
 
 32
 "Section 3. No person shall be adopted into the Southern Ute Tribe unless he is of Indian blood and has resided upon the reservation for a probationary period to be determined by the Council."
 
 
 33
 The courts have consistently recognized that in absence of express legislation by Congress to the contrary, a tribe has the complete authority to determine all questions of its own membership, as a political entity. Patterson v. Council of Seneca Nation, 245 N.Y. 433, 157 N.E. 734; Waldron v. United States, C.C., 143 F. 413; Roff v. Burney, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442. But it has been held that 25 U.S.C.A. § 163 and its predecessors qualify that power of an Indian tribe where the question involved is the distribution of tribal funds and other property under the supervision and control of the federal government. U. S. ex rel. West v. Hitchcock, 205 U.S. 80, 27 S.Ct. 423, 51 L.Ed. 718; Mitchell v. United States, 9 Cir., 22 F.2d 771; 55 I.D. 14, 39 (1934); cf. Raymond v. Raymond, 8 Cir., 83 F. 721; Nofire v. United States, 164 U.S. 657, 17 S.Ct. 212, 41 L.Ed. 588. See also United States v. Rogers, 4 How. 567, 11 L.Ed. 1105. It appears that for purposes of which the tribe has complete control, the tribe conclusively determines membership; but where departmental action is authorized, the department may approve or disapprove the membership rolls of the tribe.
 
 
 34
 But the questions of membership or whether there is a conflict between the tribal constitution and the enrollment statute are not raised by the complaint. Plaintiff alleges that she was duly enrolled as a member of the Southern Ute Tribe in accordance with 25 U.S.C.A. § 163 and remained a recognized member for some time after the tribe's incorporation. She complains that her privileges as a member have been denied her as a consequence of the wrongful acts of the defendant corporation and individuals. She does not allege that the question of her status as a shareholder or member of the tribe is in any way involved, but rather her action is in the nature of a shareholder's suit for an accounting or tort for conversion.
 
 
 35
 In Gully v. First National Bank, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70, some of the tests of a federal question were set forth as follows: "* * * To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. * * * The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. * * * A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto * * *, and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal. * * *"
 
 
 36
 Plaintiff's claims as set forth in her pleadings do not meet this test nor otherwise properly raise a federal question. The suit is a private one, unique only in its background of Indian origin. The order of dismissal for want of jurisdiction was proper and the judgment of the trial court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Also named but not served was the superintendent of the Consolidated Ute Agency
 
 
 [2]
 See first Indian Intercourse Act, July 22, 1790, c. 33, 1 Stat. 137
 
 
 [3]
 Act of March 3, 1819, c. 85, 3 Stat. 516; Act of July 9, 1832, c. 174, 4 Stat. 564; Act of June 30, 1834, c. 161, 4 Stat. 734
 
 
 [4]
 Act of March 3, 1817, c. 92, 3 Stat. 383
 
 
 [5]
 Act of March 3, 1847, c. 66, 9 Stat. 203
 
 
 [6]
 Act of March 27, 1854, c. 26, sec. 3, 10 Stat. 269
 
 
 [7]
 Act of March 3, 1885, c. 341, sec. 9, 23 Stat. 362, 385
 
 
 [8]
 Act of June 14, 1862, c. 101, 12 Stat. 427; General Allotment Act, Act of Feb. 8, 1887, c. 119, 24 Stat. 388, 25 U.S.C.A. § 331 et seq
 
 
 [9]
 Act of March 3, 1883, c. 141, sec. 2, 22 Stat. 582, 25 U.S.C.A. § 155
 
 
 [10]
 Act of July 13, 1892, c. 164, 27 Stat. 120
 
 
 [11]
 Act of June 25, 1910, c. 431, 36 Stat. 855
 
 
 [12]
 Act of June 2, 1924, c. 233, 43 Stat. 253
 
 
 [13]
 Act of June 18, 1934, c. 576, 48 Stat. 984, 25 U.S.C.A. § 461 et seq