Cora **SOLOMON** et al., Plaintiffs,

v.

Louis La**ROSE** et al., Defendants.

No. CV71–L–326.

United States District Court,
D. Nebraska.

Nov. 10, 1971.

James M. Kelley, Kelley & Thorough, Lincoln, Neb., for plaintiffs.

Jeffre P. Cheuvront, Lincoln, Neb., and Neil McCluhan, Winnebago, Neb., for defendants.

## MEMORANDUM REGARDING TEMPORARY INJUNCTION

URBOM, District Judge.

This action was commenced on October 22, 1971, by five members of the Winnebago Indian Tribe of Nebraska against the Tribal Council of the Winnebago Tribe of Nebraska and each member of the Council. The legal dispute concerns the October 5, 1971, Tribal Council election which resulted in the election of plaintiffs Solomon, Mallory and Cleveland to the Tribal Council. On October 10, 1971, they were sworn in as members of the Tribal Council by a representative of the Bureau of Indian Affairs. However, within two days following the election a petition had been circulated among members of the Winnebago Tribe. The petition, which was ultimately signed by 72 members of the Winnebago Tribe, challenged the election results because of certain alleged irregularities, specifically: (1) that persons under the influence of intoxicants were permitted to vote; (2) that elderly persons should have been assisted in their voting by two persons rather than just one; and (3) that the Sergeant at Arms permitted drunks into the voting place. On October 13, 1971, a reorganizational meeting was conducted by the Tribal Council, as it existed prior to the October 5 election, and the Tribal Council voted to deny the seating of Solomon, Cleveland and Mallory. The Tribal Council in effect invalidated the October 5 election and scheduled a new election for October 26, 1971. The plaintiffs LaRose and Snake, members of the Tribal Council, are also named as defendants. As to these plaintiffs, it is claimed that a second election would deprive them of the result of the October 5 election since they would be unable to form an intra-council election with the other plaintiffs. On October 22, 1971, this court issued a temporary restraining order to enjoin

the Tribal Council from conducting a second election which had been set for October 26, 1971, and to enjoin the Tribal Council from seating plaintiffs Solomon, Cleveland and Mallory. Apparently, the second election was held on October 26, since the Tribal Council was not properly served with notice of the proceedings in this court until after the second election. Notwithstanding this second election, the Tribal Council has complied with this court's temporary restraining order to the extent that it prevents the Tribal Council's denying Solomon, Cleveland and Mallory their Tribal Council seats.

## JURISDICTION

Perhaps the most troublesome issue before this court is whether the federal district court has subject matter jurisdiction to adjudicate a dispute existing between a member of an Indian tribe and his tribal government. The jurisdictional foundation presented to the court is 28 U.S.C. § 1343(4) and 28 U.S.C. § 1362. As to the latter statute, it is clear that it does not apply to actions brought by an individual Indian against the tribe. See Scholder v. United States, 298 F.Supp. 1282 (U.S.D.C.S. D.Cal.1969) and Quinault Tribe of Indians v. Gallagher, 368 F.2d 648 (C.A. 9th Cir. 1966).

Consequently, the determination of subject matter jurisdiction turns upon this court's interpretation of Section 1343(4) [1] in conjunction with Title II of the Civil Rights Act of 1968, 25 U.S.C. § 1301 et seq.,[2] referred to as the Indian Civil Rights Act. At present two district courts have held that § 1343(4) does provide a jurisdictional basis to protect the substantive rights guaranteed by the Indian Civil Rights Act, Dodge v. Nakai, 298 F.Supp. 26 (U.S.D. C.Ariz.1969) and Spotted Eagle v. Blackfeet Tribe of Blackfeet Indian Res., 301 F.Supp. 85, 89 (U.S.D.C.Mont. 1969), and one district court has held by implication that this section is insufficient to form a jurisdictional basis, Pinnow v. Shoshone Tribal Council, 314 F. Supp. 1157 (U.S.D.C.Wyo.1970).

Previous to enactment of the Indian Civil Rights Act, the federal courts invoked the doctrine of "internal controversy" to label their finding of no subject matter jurisdiction. This early judicial attitude is exemplified in Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529 (C.A. 8th Cir. 1967). In the *Twin Cities* case a suit was commenced by individual members of the Minnesota Chippewa Tribe against the Tribe to invalidate an Indian tribal election. One of the jurisdictional allegations by the

1. Title 28, United States Code, § 1343, provides:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\* \* \* \* \*

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

2.

"§ 1301. Definitions

"For purposes of this subchapter, the term—

"(1) 'Indian tribe' means any tribe, band, or other group of Indians subject to the jurisdiction of the United States and recognized as possessing powers of self-government;

"(2) 'powers of self-government' means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and

"(3) 'Indian court' means any Indian tribal court or court of Indian offense."

"1302. Constitutional rights

"No Indian tribe in exercising powers of self-government shall—

\* \* \* \* \*

"(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;"

plaintiffs rested upon the due process clause to the Fifth and Fourteenth Amendments. Judge Mehaffy, speaking for the court, in rejecting the claim of jurisdiction on this ground held:

" . . . Lastly, plaintiffs assert that defendants' actions have deprived plaintiffs of rights guaranteed by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. This argument ignores one of the most basic tenets of American constitutional law. The guarantees of the Due Process Clause relate solely to action by a state government, Rice v. Sioux City Memorial Park Cemetery, 349 U.S. 70, 75 S.Ct. 614, 99 L.Ed. 897 (1955); Watkins v. Oaklawn Jockey Club, 183 F.2d 440 (8th Cir. 1950), and have no application to actions of Indian tribes, acting as such. See Barta v. Oglala Sioux Tribe of Pine Ridge Res., 259 F.2d 553 (8th Cir. 1958), cert. denied, 358 U.S. 932, 79 S.Ct. 320, 3 L.Ed.2d 304 (1959). Here, neither the State of Minnesota nor any other state acted in any wise to affect plaintiffs. All plaintiffs' complaints are directed toward the Minnesota Chippewa Tribe, a federal corporation, and the agents of the United States Department of the Interior."

Also see Martinez v. Southern Ute Tribe of Southern Ute Reservation, 249 F.2d 915 (C.A. 10th Cir. 1957) cert. denied 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed. 2d 1067 and Native American Church v. Navajo Tribal Council, 272 F.2d 131 (C. A. 10th Cir. 1959).

■ Until the passage of the Indian Civil Rights Act in 1968, only the United States Court of Appeals for the Ninth Circuit in Colliflower v. Garland, 342 F.2d 369 (C.A. 9th Cir. 1965) had held that the Bill of Rights of the United States Constitution imposed a limitation on the scope of action that a tribal government could take in respect to individual Indians. It is this court's opinion that it was the intent of Congress in enacting the Indian Civil Rights Act to create *sui generis* a body of substantive rights, patterned in part on the federal Bill of Rights, to extricate the individual Indian from the legal no man's land resulting from decisions like *Twin Cities*.[3]

3. Hearings on H.R. 15419, 15122, S. 1843 Before a Subcomm. of Indian Affairs of the Comm. on Interior and Insular Affairs, 90th Cong., 2nd (1968): "Rights of Members of Indian Tribes," at pp. 15–17:

"Need for Legislation

"The need for legislation to protect the rights of the American Indian became evident as the Subcommittee on Constitutional Rights conducted its studies and hearings over the past several years, beginning in 1961.

"Title I

"A. *Denial of rights by tribal governments*

"When the subcommittee began its investigation of the constitutional rights of American Indians, Chairman Ervin wrote the Attorney General of the United States requesting his views on the constitutional rights of American Indians. Attorney General Kennedy replied as follows:

'All the constitutional guarantees apply to the American Indians in their relations with the Federal Government, or its branches, and the State governments to the same extent that they apply to other American citizens. It is not entirely clear to what extent the constitutional restrictions applicable to the Federal Government, or its branches, and to the State governments are applicable to tribal governments, but the decided cases indicate there are large areas where such restrictions are not applicable.'

"Indian tribes in the United States have been recognized and treated as distinct and independent political communities since early 1800. Indian tribes possess and exercise inherent powers of self-government which derive from the sovereign character of the tribe and not by grant or cession from Congress or the States.

"Several sections of the Constitution have been used to establish restraints on Indian self-government although Congress has exercised its powers to legislate such restraints on numerous occasions. The tribe retains quasi-sovereign authority over its internal affairs, and thereby exercises final, un-

checked authority over many facets of an Indian's life.

"The contemporary meaning of tribal sovereignty is defined in the case of Iron Crow v. Oglala Sioux Tribe, 231 F.2d 89 (8th Cir. 1956), as follows:

'It would seem clear that the Constitution, as construed by the Supreme Court, acknowledges the paramount authority of the United States with regard to Indian tribes, but recognizes the existence of Indian tribes as quasi-sovereign entities possessing all the inherent rights of sovereignty except where restrictions have been placed thereon by the United States itself.'

"In discussing the scope of the meaning of tribal sovereignty, Felix Cohen in his book entitled "Federal Indian Law," said:

'The whole course of judicial decision on the nature of Indian tribal powers is marked by adherence to three fundamental principles:

'(1) The Indian tribe possesses, in the first instance, all the powers of any sovereign state.

'(2) Conquest renders a tribe subject to the legislative power of the United States, and, in substance, terminates the external powers of sovereignty of the tribe, e. g. its power to enter into treaties with foreign nations, but does not, by itself, affect the internal sovereignty of the tribe; that is, its power of local self-government.

'(3) These powers are subject to qualification by treaties and by express legislation by Congress, but, save as as [sic] thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and in their duly constituted organs of government.'

"The courts have repeatedly upheld the quasi-sovereign status of the tribe; however, the Congress has the prerogative placing limitations upon tribal autonomy.

"Since 1885 and the enactment of the Seven Major Crimes Act, tribal authority has been markedly circumscribed by congressional action. That sovereignty, moreover, has been further limited in those instances in which States, acting pursuant to Public Law 83–280 have undertaken to assume civil and criminal jurisdiction over Indians. There remain, however, significant areas in which the tribe retains complete authority over the lives of its members.

"One of the most serious inadequacies in tribal government arises from its failure to conform to traditional constitutional safeguards which apply to State and Federal Governments. As Senator Anderson, a member of the Committee on Interior and Insular Affairs has noted: 'An Indian citizen has all the rights of other citizens while he is off the reservation, but on the reservation "in the absence of Federal legislation" he has only the rights given to him by the tribal governing body.'

"Chairman Ervin has made a similar observation: 'It appears that a tribe may deprive its members of property and liberty without due process of law and may not come under the limitation of Federal and State governments as stated in the Bill of Rights. However, the sovereignty of an Indian tribe can be limited by acts of Congress.'

"In examining the legal status of the American Indian, it is first necessary to appreciate what transpires where tribal law denies Indians the constitutional protection accorded other citizens. As a corollary consideration, it is also important to understand whether a tribal Indian can successfully challenge on constitutional grounds specific acts or practices of the Indian tribe. A negative response to this question was given in Elk v. Wilkins, 112 U.S. 94 [5 S.Ct. 41, 28 L.Ed. 643] (1884) for example, where the unilateral renunciation of tribal affiliation by an Indian was held to be insufficient to confer citizenship. An affirmative act of recognition by the Federal Government was deemed essential to establish citizenship. Absent such an affirmative act a State was able to deny Indians the right to vote in a State election. Only recently has this right been held to be irreconcilable with the 15th amendment and the Citizenship Act of 1924, 43 Stat. 253 (1924), 8 U.S.C. 1401 et seq. See e. g., Montov [Montoya] v. Bolack, 70 N.Mex. 196 [372 P.2d 387] (1962); Harrison v. Laveen, 67 Ariz. 337 [196 P.2d 456] (1948).

"Because general acts of Congress were thought not to be applicable to Indians, general constitutional provisions received similar interpretation. In Talton v. Mayes, 163 U.S. 376 [16 S.Ct. 986, 41 L.Ed. 196] (1896), the Supreme Court refused to apply the fifth amendment to the Constitution to invalidate a tribal law that established a five-man grand jury. In this case the Court held that the Cherokee Nation, as an autonomous body, had the power to define crimes and independently provide for criminal procedure. Recognizing that the fifth amendment

limits only the powers of the Federal Government, the Court rejected the argument that the power of local government exercised by the Cherokees was Federal in nature, that is, based on the Constitution. The Court also said:

'It follows that as the powers of self-government enjoyed by the Cherokee nation existed prior to the Constitution, they are not operated upon by the Fifth Amendment which, as we have said, had for its sole object to control the powers conferred by the Constitution on the National Government.' (163 U.S. 376 at 384 [16 S.Ct. 986] (1894)).

"Only a limited number of cases involving the denial of constitutional rights in Indian court proceedings reach the Federal courts due to the absence of a right to appeal tribal court decisions to Federal courts. The case of Colliflower v. United States [Garland] 342 F.2d [369] (1965), virtually stands alone in upholding the competence of a Federal court to inquire into the legality of an order of an Indian court. Federal courts generally have consistently refused to impose constitutional standards on the tribes on the theory that these standards apply only to State or Federal governmental action. For example, the guarantee of representation by legal counsel has been held not to apply in tribal court action. In Glover v. United States, 219 F.Supp. 19 at 21 (D.Mont. 1963), the Court stated:

'The right to be represented by counsel is protected by the Sixth and Fourteenth Amendments. These Amendments, however, protect * * * [this right] only as against action by the United States in the case of the * * * Sixth * * * [Amendment], and as against action by the states in the case of the Fourteenth Amendment, Indian tribes are not states within the meaning of the Fourteenth Amendment.'

"In the case of Native American Church v. Navajo Tribal Council, 272 F.2d 131 (10 Cir. 1959), the Court by implication, held that a tribal Indian cannot claim protection from illegal search and seizure protected by the fourth amendment. The case involved the relationship between tribal law and first amendment guarantees of freedom of religion. The Native American Church is a religious sect to which many Indians belong. Peyote, a hallucinating agent, is used by members of this church in their religious cere-

monies. Its use is often prohibited by State and tribal laws. In State v. Big Sheep, 75 Mont. 219 [243 P. 1067] (1962), for example, the constitutionality of a tribal ordinance prohibiting its importation and use was challenged on the grounds that it violated the first, fourth and fourteenth amendments. The tenth circuit denied relief noting lack of Federal jurisdiction, and observed that internal affairs such as police powers were solely within the cognizance of the various tribes and that the general law of the United States could not interfere with purely internal matters. (272 F.2d 131 at 134–135.) In refusing to concede the applicability of the fourteenth amendment to Indian tribes, the court stated:

'No provision in the Constitution makes the First Amendment applicable to Indian nations nor is there any law of Congress doing so. It follows that neither under the Constitution nor the laws of Congress, do the Federal courts have jurisdiction of tribal laws or regulations, even though they may have an impact to some extent on forms of religious workship.' (272 F.[2d] 131 at 135.)

"In 1954, an effort to redress tribal infringements of religious freedoms by involving civil rights statutes also failed in the case of Toledo v. Pueblo De Jemez, 119 F.Supp. 429 (D.N.Mex. 1954). In this case, six Jemez Pueblo Indians brought an action for declaratory judgment against their tribe, the tribal council, and its governor charging that they had been subjected to indignities, threats, and reprisals solely because of their Protestant faith. Despite a tribal ordinance purporting to guarantee freedom of religion, the tribal council had refused to permit them to bury their dead in the community cemetery and had denied them permission to build a church. The court acknowledged that the tribal government acts represented a serious invasion of religious liberties; however, it concluded that these actions were not taken 'under color of any statute, ordinance, regulation, custom or usage of any State or Territory,' as required to invoke the Civil Rights Act, 119 F.Supp. 429 at 431–432. Thus, the Indians had no cause of action under the Civil Rights Act in the Federal Courts.

"In addition, a tribe can impose a tax (see Barta v. Oglala Sioux Tribe, 259 F.2d 553 (8th Cir. 1958), cert. denied, 358 U.S. 932 [79 S.Ct. 320, 3 L.Ed.2d 304] (1959); Iron Crow v.

■ I cannot agree with the result reached by Judge Kerr in *Pinnow* for two reasons. First, all the federal cases cited for the proposition that subject matter jurisdiction did not exist, with the exception of Motah v. United States, 402 F.2d 1 (C.A. 10th Cir. 1968), were decided before the enacting of the Indian Civil Rights Act. The *Motah* case did not involve a dispute arising under that Act. Second, Congress in addition to providing a body of substantive rights, also created habeas corpus jurisdiction in the federal district courts by 25 U.S.C. § 1303 to enforce these rights. It does not follow that Congress intended § 1303 to be the exclusive jurisdictional basis for enforcement. Such a finding would render nugatory the rights secured by provisions (1), (5) and (8) of § 1302. The reason for Congress' enacting a habeas corpus remedial statute lies in the explicit wording of 28 U.S.C. § 2241(c) (1)–(5),[4] which palpably indicates that tribal courts or councils would not be subject to jurisdiction. Therefore, Congress felt compelled to enact a special jurisdictional statute for habeas corpus relief in the federal courts.[5]

In contrast, there existed no need to provide a special jurisdictional statute to enforce provisions (1), (5) and (8) of § 1302, since a basis of jurisdiction was already present—28 U.S.C. § 1343(4).

■ It is the conclusion of this court that subject matter jurisdiction exists by virtue of allegations within the scope of 25 U.S.C. § 1302(8) and it is properly enforceable through 28 U.S.C. § 1343(4).

## BASIS FOR TEMPORARY INJUNCTION

■ Judge Bazelon in Perry v. Perry, 88 U.S.App.D.C. 337, 190 F.2d 601 (1951) succinctly enumerates the relevant considerations which bear upon the issuance of a temporary injunction:

" . . . When a motion for preliminary injunction is presented to a court in advance of hearing on the merits, it is called upon to exercise its discretion 'upon the basis of a series

---

Oglala Sioux Tribe, 231 F.[2d] 89 (8th Cir. 1956), or revoke tribal membership rights without complying with due process requirements. Martinez v. Southern Ute Tribe, 249 F.2d 915 (10th Cir. 1957), cert. denied, 356 U.S. 960 [78 S.Ct. 998, 2 L.Ed.2d 1067] (1958).

"These cases illustrate the continued denial of specific constitutional guarantees to litigants in tribal court proceedings, on the ground that the tribal courts are quasi-sovereign entities to which general provisions in the Constitution do not apply.

"Section 102 of title I provides that any Indian tribe in exercising its powers of local self-government shall, with certain exceptions, be subject to the same limitations and restraints as those which are imposed on the Government of the United States by the Constitution."

4. Title 28, United States Code, § 2241 (c) provides:

"(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

(5) It is necessary to bring him into court to testify or for trial."

5. " § 1303. Habeas corpus
"The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe.
Pub.L. 90–284, Title II, § 203, Apr. 11, 1968, 82 Stat. 78."

of estimates: the relative importance of the rights asserted and the acts sought to be enjoined, the irreparable nature of the injury allegedly flowing from denial of preliminary relief, the probability of the ultimate success or failure of the suit, the balancing of damage and convenience generally. A mere listing of the guiding considerations demonstrates their intangible nature, especially when no attempt is made at this stage to decide finally the questions raised.' "

A. The Rights Asserted and Acts Enjoined.

The Winnebago Indian Tribe operates pursuant to Article VI of the tribal con-stitution which prescribes the removal power of the tribal council [6] and in Article II of the bylaws of the tribe which prescribe the qualification of officers of the tribal council.[7] In essence the plaintiffs Solomon, Cleveland and Mallory seek to enjoin what they allege to be illegal acts of exclusion under the Winnebago Constitution. The right asserted by these plaintiffs is a right to fundamental due process in its most basic sense.[8] Both the right asserted and the acts sought to be enjoined clearly balance in favor of these three plaintiffs.

B. Irreparable Nature of the Injury.

The denial [9] of these plaintiffs of their seats on the Tribal Council results

6. "ARTICLE VI—REMOVAL
"SECTION, 1. The tribal council may by a two-thirds affirmative vote expel any member for neglect of duty or gross misconduct. Before any vote for expulsion is taken on the matter, such member shall be given an opportunity to answer any and all charges at a designated council meeting, the decision of the tribal council shall be final.
"SECTION 2. The tribal council shall have power to fill all vacancies caused by death, removal, resignation, or otherwise, such appointment to be in force and effect until the next general election."

7. "ARTICLE II—QUALIFICATION OF OFFICERS
"SECTION 1. Members of the council must be twenty-five years of age or over, bona fide residents of the Winnebago Reservation of Nebraska; it is provided further that the tribal council shall be the judge of the qualifications of its own members."

8. Hurtado v. California, 110 U.S. 516, 535–536, 4 S.Ct. 111, 121, 28 L.Ed. 232 (1884) (Harlan dissenting) states:
"But it is not to be supposed that these legislative powers are absolute and despotic, and that the amendment prescribing due process of law is too vague and indefinite to operate as a practical restraint. It is not every act, legislative in form, that is law. Law is something more than mere will exerted as an act of power. It must be not a special rule for a particular person or a particular case, but, in the language of Mr. Webster, in his familiar definition, 'the general law, a

law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial,' so 'that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society,' and thus excluding, as not due process of law, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments and decrees, and other similar special, partial and arbitrary exertions of power under the forms of legislation. Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude. And the limitations imposed by our constitutional law upon the action of the governments, both State and national, are essential to the preservation of public and private rights, notwithstanding the representative character of our political institutions. The enforcement of these limitations by judicial process is the device of self-governing communities to protect the rights of individuals and minorities, as well against the power of numbers, as against the violence of public agents transcending the limits of lawful authority, even when acting in the name and wielding the force of the government."

9. Some question exists as to whether the act of the Tribal Council was that of excluding the three elected members, or expelling them, because they took the

in injury that cannot be calculated in terms of monetary damages, but rather adversely affects interests that only equitable relief is structured to redress by injunction.

### C. The Probability of Ultimate Success on the Merits.

The determination of this question is rendered difficult by the novelty of the suit, complicated by a recent Congressional enactment that marks a departure from the pre-1968 judicial decisions. However, I conclude that under the facts and circumstances of this case success on the merits is probable. As indicated earlier in this opinion, Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232 (1884), implies that the exercise of power arbitrarily, without apparent authority, operates to create a governmental edict, violative of due process of law. Due process is more than requiring that a government's decision be based upon a rational evidentiary basis and that certain concomitants of procedural safeguards be observed, but entails the overriding notion that government must operate within the bounds of the instrument which created it. On the merits some guidance can be sought from Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) and the earlier case of Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L. Ed.2d 235 (1966) in determining the authority of legislative bodies' right to exclude newly elected members. The Bond case holds that the First Amendment to the Constitution is a direct restraint on the power of the state legislature to exclude a member. A fortiori, the due process clause of the Fourteenth Amendment would also operate as such a restraint. The language contained in the

Winnebago Constitution is similar to that contained in the Federal Constitution [10] with respect to exclusion and expulsion, and the Supreme Court in Powell expressed the view that judicial review of the legislative action is appropriate. In the present case, the allegations contained in the pleadings are distinguishable from Powell, since in that case there existed no dispute as to the regularity of the election; but if such a distinction cuts in either direction, it makes the actions of the legislative body more questionable. In the absence of an express provision in the Indian Constitution to provide the legislative body, the Tribal Council, with the power to rule upon contested elections, a judicial forum may be the only proper forum for redress.

Stated in summary fashion, I conclude that it is probable, although final determination must be made at a time when the matter of issuance of a permanent injunction is before the court, that the Tribal Council (1) had no authority to exclude elected members except upon a finding that those members were disqualified because they were under twenty-five years of age or were not bona fide residents of the Winnebago Reservation of Nebraska,[11] (2) had no authority to expel elected members except for neglect of duty or gross misconduct of the elected members,[12] (3) had no authority to invalidate an election, and (4) did not find that the elected members were disqualified or were guilty of neglect of duty or gross misconduct. Accordingly, it is probable that the Tribal Council exceeded its authority, thereby denying the plaintiffs Solomon, Cleveland and Mallory of due process of law.

A temporary injunction will issue today.

oath of office and therefore, perhaps, were "seated." It may be that the Council did neither of these, but declared the election invalid.

10. See Article I, Section 5, Clause 1, and Article I, Section 2, Clause 2, of the Constitution of the United States and

Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) which construes those provisions.

11. See footnote 7.

12. See footnote 6.