David **LOHNES**, Jr., by his Guardian Ad Litem, **Ruth Ann Lohnes**, Plaintiff,

v.

Aloysius **CLOUD**, Defendant.

Civ. No. 4778.

United States District Court,
D. North Dakota,
Northeastern Division.

Nov. 23, 1973.

Neil Thompson, Foughty, Christianson & Thompson, Devils Lake, N. D., for plaintiff.

John M. Olson, Sp. Asst. Atty. Gen., Unsatisfied Judgment Fund, Bismarck, N. D., for defendant.

## MEMORANDUM OF DECISION

BENSON, Chief Judge.

Plaintiff brought this action for damages resulting from an automobile accident. The Attorney General for the State of North Dakota, representing the North Dakota Unsatisfied Judgment Fund, has moved in behalf of the Defendant, to dismiss the action.[1]

The facts relevant to a determination of the issues raised by the Defendant's motion are not in dispute. The Plaintiff and Defendant are Indians, and are both enrolled members of the Devils Lake Sioux Tribe, located on the Fort Totten Indian Reservation in North Dakota. The accident occurred within the boundaries of the Reservation, and at the time of the accident, both were residents of the Reservation. Section 1.2(c) of the Devils Lake Sioux Tribal Code of Justice provides:

> "The (Tribal) Court shall have jurisdiction (1) over all civil matters where all parties are Indians within the jurisdiction of the court . . .."

On his motion to dismiss, Defendant asserts in substance:

1. There is no diversity of citizenship and no federal question has been raised.

2. The North Dakota Supreme Court in Gourneau v. Smith, 207 N.W.2d 256 (N.D.1973), has held that the state court has no jurisdiction, and therefore this court would have no jurisdiction.[2]

3. Jurisdiction remains exclusively with the Devils Lake Sioux Tribe.

Plaintiff's response is "that the Tribal Court, as it is instituted, relative to civil proceedings, is unconstitutional in that it violates the due process provisions of the Indian Bill of Rights, 25 U.S.C. § 1302(8)[3], and of the Constitution of the United States under the due process [clause] as specified in the 5th and 14th Amendment". Plaintiff also calls atten-

---

1. Section 39–17–04, North Dakota Century Code:

    ". . . the attorney general may enter an appearance, file a defense, appear by counsel at the trial or take such other action as he may deem appropriate on behalf and in the name of the defendant, and may thereupon, on behalf and in the name of the defendant, conduct his defense, and all acts done in accordance therewith shall be deemed to be acts of the defendant. . . ."

2. Lack of State Jurisdiction. Gourneau v. Smith, 207 N.W.2d 256 (N.D.1973), held: "Until the Indians on the reservation act to consent to State jurisdiction, such jurisdiction may not be assumed by the courts of the State of any cause of action arising within the boundaries of the Indian reservation involving Indians." at 259. Defendant's second argument can be phrased as follows: Since plaintiff is precluded from instituting an action in state court, he cannot invoke federal jurisdiction, citing Hot Oil Service Company, Inc. v. Hall, 366 F.2d 295 (9th Cir. 1966) and Woods v. Interstate

Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949). However, these decisions concern only diversity cases as language in defendant's brief from *Woods* illustrates:

> "The contrary result would create discriminations against citizens of the State in favor of those authorized to invoke the diversity jurisdiction of the federal courts. It was that element of discrimination that Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, was designed to eliminate." at 538, 69 S.Ct. at 1237.

    Since there is no diversity under 28 U.S.C. § 1332(a) we have no need to consider this question. Oneida Indian Nation of N. Y. State v. County of Oneida, N. Y., 464 F.2d 916 (2nd Cir. 1972).

3. § 1302 Constitutional Rights.

    "No Indian tribe in exercising powers of self-government shall—
    (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;"

tion to Section 11.4 of the Devils Lake Sioux Tribe which reads: "All trials shall be before the court without a jury except in criminal cases . . .." Plaintiff presumably relies upon the Seventh Amendment in asserting that Section 11.4 is unconstitutional.

Diversity jurisdiction is obviously not present in this case. Therefore, the issue on the motion to dismiss is whether a federal question has been raised. Prior to the passage of 25 U.S.C. § 1302, the Indian Bill of Rights, the United States Constitution imposed few, if any, limitations upon the scope of action that a tribal government could take with respect to individual Indians. Twin City Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529 (8th Cir. 1967); Barta v. Oglala Sioux Tribe, 259 F.2d 553 (8th Cir. 1958); Native American Church v. Navajo Tribal Council, 272 F.2d 131 (10th Cir. 1959). The basis for the non-application of United States Constitution to tribal institutions is founded upon the concept of tribal sovereignty. This concept was succinctly defined by the Eighth Circuit in Iron Crow v. Oglala Sioux Tribe, 231 F.2d 89 (8th Cir. 1956), as follows:

> "It would seem clear that the Constitution, as construed by the Supreme Court, acknowledges the paramount authority of the United States with regard to Indian Tribes as *quasi* sovereign entities possessing all the inherent rights of sovereignty except where restrictions have been placed thereon by the United States itself."

Hearings on the Indian Bill of Rights produced three fundamental principles governing judicial inquiry into tribal government structure:

> "The whole course of judicial decision on the nature of the Indian tribal powers is marked by adherence to three fundamental principles:

> '(1) The Indian tribe possesses, in the first instance, all the powers of any sovereign state.

> '(2) Conquest renders a tribe subject to the legislative power of the United States, and, in substance, terminates the external powers of sovereignty of the tribe, e. g. its power to enter into treaties with foreign nations, but does not, by itself, affect the internal sovereignty of the tribe; that is, its power of local self-government.

> '(3) These powers are subject to qualification by treaties and by express legislation by Congress, but, save as as [sic] thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and in their duly constituted organs of government.' " [4]

It appears that the impetus for the Indian Bill of Rights was founded in Congressional concern for the protection of individual Indians from a denial of Constitutional rights by tribal action [5] As such, it has been stated, "that it was the intent of Congress in enacting the Indian Civil Rights Act to create *sui generis* a body of substantive rights, patterned *in part* on the federal Bill of Rights, to extricate the individual Indian from [a] legal no man's land . . ." Solomon v. LaRose, 335 F. Supp. 715, 718 (D.Neb.1971). (emphasis added). While § 1302 has indeed encroached upon, and redefined, tribal sovereignty, Daly v. United States, 483 F.2d 700 (8th Cir. 1973), it is clear that the act is not meant to substitute a federal forum for tribal court. This is in essence what this court is asked to do, if we are to grant plaintiff the relief sought. This court cannot find a Congressional intent to impose all the procedural and substantive safeguards of a federal forum upon a tribal court. Indeed, such action would be inconsistent with Congressional adoption of a policy of self-determina-

4. Hearings on H.R. 15419, 15122, S. 1843 Before a Subcommittee of Interior and Insular Affairs, 90th Cong., 2nd (1968): "Rights of Member Tribes." at pp. 15–17, quoted in Solomon v. LaRose, 335 F.Supp. 715, 718, 721 n.3 (D.Neb.1971).

5. Id.

tion concerning the Indian Community.[6] This policy, set forth in Senate Concurrent Resolution 26, as passed on December 11, 1971, and as is relevant to the issues before this court is stated:

"That it is the sense of Congress that—

(1) our national Indian policy shall give full recognition to and be predicated upon the unique relationship that exists between this group of citizens and the Federal Government and that a governmentwide commitment shall derive from this relationship that will be designed to give Indians the freedom and encouragement to develop their individual, family, and community potential and to determine their own future to the maximum extent possible; . . .

(3) improving the quality and quantity of social and economic development efforts for Indian people and maximizing opportunities for Indian control and self-determination shall be a major goal of our National Indian policy;"

◼ The case at bar presents the conflicting concerns for individual rights and for tribal autonomy, but judicial decisions have rejected the concept that as between a person and an Indian Tribe, § 1302 incorporates all individual rights guaranteed by the Constitution of the United States. Daly v. United States, 483 F.2d 700 (8th Cir. 1973); O'Neal v. Cheyenne River Sioux Tribe, 482 F.2d 1140 (8th Cir. 1973); White Eagle v. One Feather, 478 F.2d 1311 (8th Cir. 1973); Groundhog v. Keller, 442 F.2d 674 (10th Cir. 1971); Seneca Constitutional Rights Organization v. George, 348 F.Supp. 51 (W.D.N.Y.1972); Spotted Eagle v. Blackfeet Tribe of Blackfeet Indian Rservation, 301 F.Supp. 85 (D. Mont.1969).

In answering contentions similar to those presented here, the following language from *Groundhog* is dispositive:

"Plaintiffs also urge that the due process clause of the Fifth Amendment and the equal protection and due process clauses of the Fourteenth Amendment and the provisions of the Fifteenth Amendment, by the passage of .25 U.S.C. § 1302(8) of the Indian Bill of Rights, have been made applicable to the Cherokee Tribe.

"The provisions of the Constitution of the United States have no application to Indian nations or their governments, except as they are expressly made so by the Constitution (the Commerce Clause), or are made applicable by an Act of Congress.

We think the legislative history of the so-called Indian Bill of Rights refutes the contentions of plaintiffs stated above.

The original bill to provide an Indian Bill of Rights, considered by the Senate Subcommittee, was brief and badly worded. It read as follows:

'* * * any Indian tribe, in exercising its powers of local self-government shall be subject to the same limitations and restraints as those which are imposed on the Government of the United States by the United States Constitution.'

There were many objections to the broad language of the bill at the hearing, particularly as to the Fifteenth Amendment restraints embraced in the original bill.

The Department of the Interior submitted a substitute bill, which, with minor revisions, was introduced in the 90th Congress and eventually enacted into law as the present Indian Bill of Rights.

In its endorsement of the substitute bill, the summary of the report of the Senate Subcommittee on the Judiciary stated:

'The Department of Interior's bill would, in effect, impose upon the Indian governments the same restrictions

---

6. Cong.Rec: S.Con.Res. 26, 92nd Cong., 1st Sess. 117 Cong.Rec. 46383 (1971). *See generally* Dean, The Consent of the Governed

—A New Concept in Indian Affairs? 48 N.Dak.L.Rev. 533 (1972).

applicable presently to the Federal and State governments with several notable exceptions, viz., the 15th Amendment, certain of the procedural requirements of the 5th, 6th, and 7th amendments, and, in some respects, the equal protection requirement of the 14th amendment.'

The summary of the report of the Subcommittee was endorsed and adopted by the Senate Committee on the Judiciary. Such report makes it clear that Congress intended that the provisions of the Fifteenth Amendment, certain procedural provisions of the Fifth, Sixth, and Seventh Amendments, and in some respects the equal protection requirement of the Fourteenth Amendment should not be embraced in the Indian Bill of Rights." 442 F.2d at 681, 682.

The Eighth Circuit language in *O'Neal* is instructive as to the restrictive application of § 1302 to tribal courts, as well as the rationale underlying it.

"Congress clearly did not intend to detract from the continued vitality of the tribal courts by passage of this legislation. . . ." 482 F.2d at 1144, n. 1.

"However, it is clear to us that Congress wished to protect and preserve individual rights of the Indian peoples, with the realization that this goal is best achieved by maintaining the unique Indian culture and necessarily strengthening tribal governments. From this perspective an exhaustion requirement is consistent with the statute.

Prior to the adoption of the Indian Bill of Rights, the courts respected the need of Indians to maintain strong tribal governments. In 1959 the Supreme Court was faced with a suit by a non-Indian general store operator, who conducted his business on an Indian reservation, against an Indian couple. The non-Indian obtained a judgment in state court. The Supreme Court reversed on the basis that the state court lacked jurisdiction to determine the matter. The Court noted that it would not:

'undermine the authority of the tribal courts over Reservation affairs . . . [which] would infringe on the right of the Indians to govern themselves. . . . The cases in this Court have consistently guarded the authority of Indian governments over their reservations. . . .'

*Since the passage of the Indian Bill of Rights we have recognized the fear that the courts may 'apply broadly such elusive and expanding concepts as due process . . . without sensitive regard for their impact on tribal structures and values.'*

'Discussion of the Indian Bill of Rights showed no intent to use the statute as an instrument for modifying tribal cultural attitudes in order to facilitate assimilation of Indians into the non-white community. In fact, the committee showed a positive intent to avoid requirements injurious to the tribes' capacity to function as autonomous governmental units.' " at 1144, 1145. (emphasis added) (citations omitted).

Furthermore, plaintiff's claim that by being limited to tribal court with its alleged deficiencies violates the Fifth, Seventh, and Fourteenth Amendments to the Constitution of the United States or the due process guarantee of 25 U.S.C. § 1302(8) is not persuasive in view of the rule that Constitutional restrictions apply to Indian Tribes only by the express Act of Congress, and in view of the specific restrictions upon judicial functions provided in § 1302.[7]

---

7. § 1302. Constitutional rights.
"No Indian tribe in exercising powers of self-government shall—
(3) subject any person for the same offense to be twice put in jeopardy;

(4) compel any person in any criminal case to be a witness against himself;
(6) deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and

The jurisdiction in this case is vested in the tribal court. The United States District Court being without jurisdiction in the matter,

It is ordered the Defendant's motion to dismiss is granted, and the case is dismissed.

See also D.C., 366 F.Supp. 628.

cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;

(7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of six months or a fine of $500, or both;

(10) deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons."