Julia MARTINEZ, on behalf of herself and all others similarly situated, and Audrey Martinez, on behalf of herself and all others similarly situated, Plaintiffs,

v.

SANTA CLARA PUEBLO, and Lucario Padilla, Individually and in his capacity as Governor of the Santa Clara Pueblo.

Shoshone Indian Tribe of the Wind River Reservation, Amicus Curiae.

Civ. No. 9717.

United States District Court,
D. New Mexico.

June 25, 1975.

**6**

Alan R. Taradash, Richard B. Collins, Window Rock, Ariz., for plaintiffs.

Marc Prelo, Albert, Prelo & Berlin, P. A., Albuquerque, N. M., for Santa Clara Pueblo and Paul Tafoya.

Marvin J. Sonosky and Howard L. Sribnick, Washington, D. C., for Amicus Curiae Shoshone Indian Tribe.

## MEMORANDUM OPINION ON JURISDICTION

Plaintiffs, Julia Martinez and her daughter, Audrey Martinez, bring this suit, each individually and as the representative of a class, against the Santa Clara Pueblo and Governor Lucario Padilla, individually and in his capacity as governor of the Pueblo.[1] Plaintiffs seek a declaratory judgment that a portion of a tribal ordinance which denies Pueblo membership to the children of women (but not men) who marry non-members of the Pueblo violates 25 U.S. C. § 1302(8). This statute prohibits a tribal government in the exercise of its power of self-government from denying "to any person within its jurisdiction the equal protection of its laws or depriv(ing) any person of liberty or property without due process of law." Plaintiffs seek an injunction against the further enforcement of the ordinance.

The Ordinance of 1939 reads as follows:

Be it ordained by the Council of the Pueblo of Santa Clara, New Mexico, in regular meeting duly assembled, that hereafter the following rules shall govern the admission to membership to the Santa Clara Pueblo:

1. All children born of marriages between members of the Santa Clara Pueblo shall be members of the Santa Clara Pueblo.

2. All children born of marriages between male members of the Santa Clara Pueblo and non-members shall shall be members of the Santa Clara Pueblo.

3. Children born of marriages between female members of the Santa Clara Pueblo and non-members shall not be members of the Santa Clara Pueblo.

4. Persons shall not be naturalized as members of the Santa Clara Pueblo under any circumstances.

Plaintiffs attack subparts two and three of the ordinance only.

---

1. At time of trial, Paul Tafoya was the duly elected governor of the Pueblo and was sued individually and in his official capacity. Lucario Padilla was elected governor some- time after the case was tried, and has been substituted as a defendant, pursuant to F.R. Civ.P. 25(d).

Jurisdiction was alleged to be conferred by 25 U.S.C. § 1302(8) and 28 U.S.C. § 1343(4). Defendants vigorously contest the question of jurisdiction. The following memorandum is filed at this time concerning the conclusion of law that jurisdiction exists over this action.

Plaintiff Julia Martinez is a female member of the Santa Clara Pueblo who is married to a non-member, Myles Martinez, a Navajo Indian. Plaintiff Audrey Martinez is one of eight surviving children of the marriage. Audrey and the other Martinez children have been denied membership in the Pueblo pursuant to the 1939 Ordinance because their father is not a member of the Pueblo. Defendant Santa Clara Pueblo is an Indian Tribe which was reorganized and adopted a constitution under the authority of 25 U.S.C. § 476. Defendant Lucario Padilla is the duly elected Governor of the Pueblo, charged by the law of Santa Clara (Santa Clara Constitution, Article V; Santa Clara By-Laws, Article 1, Section 1) with enforcing the laws of the Pueblo, "civil and criminal, written and unwritten."

Prior to trial, defendants twice moved to dismiss this case for lack of subject matter jurisdiction. On the first motion to dismiss, defendants contended that federal courts lack jurisdiction over intertribal controversies, particularly those involving membership disputes, on the authority of *Martinez v. Southern Ute Tribe*, 249 F.2d 915 (10th Cir. 1957), cert. den., 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067, reh. den., 357 U.S. 924, 78 S.Ct. 1374, 2 L.Ed.2d 1376, and similar cases. The motion was denied at that time.

*Martinez*, supra, and its progeny decided before the enactment of the Indian Civil Rights Act, 25 U.S.C. § 1301 et seq., held only that intra-tribal controversies, among them membership disputes, did not "arise under" the Constitution, laws or treaties of the United States, as they existed prior to the Indian Civil Rights Act, and that therefore 28 U.S.C. § 1331 did not confer subject matter jurisdiction on a federal district court to hear such a case. Since the enactment of the Indian Civil Rights Act, several courts have held that jurisdiction is conferred by virtue of the Act and 28 U.S.C. § 1331. *Dodge v. Nakai*, 298 F.Supp. 17, 25 (D.Ariz.1968); *Loncassion v. Leekity*, 334 F.Supp. 370 (D.N.M.1971); *Contra, Cornelius v. Moxon*, 301 F.Supp. 783 (D.N.D.1969). See also *Colliflower v. Garland*, 342 F.2d 369 (9th Cir. 1965); *Settler v. Yakima Tribal Council*, 419 F.2d 486 (9th Cir. 1969), cert. den., 398 U.S. 903, 90 S.Ct. 1690, 26 L.Ed.2d 61 (1970) (holding jurisdiction under 28 U.S.C. § 1331 on the basis of the law as it existed prior to the enactment of the Indian Civil Rights Act). Thus, *Martinez* and its progeny are not on point as to the jurisdictional question presented.

While the Tenth Circuit has not decided whether 25 U.S.C. § 1302(8) and 28 U.S.C. § 1343(4) confer jurisdiction over cases such as this, other courts which have considered this question have almost uniformly held in favor of jurisdiction. *Crowe v. Eastern Band of Cherokee Indians*, 506 F.2d 1231 (4th Cir. 1974); *Laramie v. Nicholson*, 487 F.2d 315 (9th Cir. 1973), cert. den., 419 U.S. 871, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974); *Johnson v. Lower Elwha Tribal Community*, 484 F.2d 200 (9th Cir. 1973); *White Eagle v. One Feather*, 478 F.2d 1311 (8th Cir. 1973); *Daly v. United States*, 483 F.2d 700 (8th Cir. 1973); *Brown v. United States*, 486 F.2d 658 (8th Cir. 1973); *Luxon v. Rosebud Sioux Tribe of South Dakota*, 455 F.2d 698 (8th Cir. 1972); *Seneca Constitutional Rights Organization v. George*, 348 F.Supp. 48 (W.D.N.Y.1972); *Solomon v. La Rose*, 335 F.Supp. 715 (D. Neb.1971); *Spotted Eagle v. Blackfeet Tribe*, 301 F.Supp. 85 (D.Mont.1969). See also *Dodge v. Nakai*, supra, (where jurisdiction appears to have been upheld alternatively under 28 U.S.C. § 1331 or 28 U.S.C. § 1343(4) and 25 U.S.C. § 1302(8)). *Contra Yellow Bird v. Ogla-*

la Sioux Tribe, 380 F.Supp. 438 (D.S.D. 1974); Lefthand v. Crow Tribal Council, 329 F.Supp. 728 (D.Mont.1971). In addition, these cases, either by implication or expressly, have held that the Indian Civil Rights Act abrogates a tribe's sovereign immunity for purposes of suit under the Act. See also Loncassion v. Leekity, supra.

Several of these cases are closely on point. In Laramie, supra, plaintiffs were children alleging a membership ordinance was being applied in a discriminatory manner, in violation of the equal protection clause of the Indian Civil Rights Act. The Ninth Circuit upheld jurisdiction, almost without discussion, on the basis of its earlier decision in Johnson v. Lower Elwha Tribal Community, supra, noting that while Johnson involved the due process clause of 25 U.S.C. § 1302(8) in the context of revocation of a lease of tribal lands, "we see no difference in principle that distinquishes our Johnson case from this case." 487 F.2d 315, 316.

The case of Yellow Bird v. Oglala Sioux Tribe, supra, also involved an equal protection challenge to a tribal membership provision. In that case, however, the trial court granted defendants' motion to dismiss, holding that it lacked subject matter jurisdiction over the case. In Yellow Bird, plaintiffs sought to run in the Oglala primary election, apparently for positions as candidates for the tribal council. The Oglala Sioux Tribal election board refused to place their names on the ballot, apparently on the grounds that plaintiffs were barred from membership in the tribe by a tribal constitutional provision which restricted membership to those children born to a member of the tribe who was a resident of the reservation

at the time of the birth of the child. The trial court based its decision on the language of the leading Eighth Circuit case on jurisdiction under the Indian Civil Rights Act, Luxon v. Rosebud Sioux Tribe of South Dakota, 455 F.2d 698 (8th Cir. 1972) that "(I)n our opinion, 28 U.S.C. § 1343(4) gives the district court jurisdiction to determine, in a proper case, whether an Indian Tribe has denied to one of its members any of the rights given to members under the Indian Bill of Rights." Id. at 700.

The Yellow Bird court cast the question as one of interpretation of the Act to determine whether the equal protection guarantee of § 1302(8) of the Act extended to the situation presented, and after an examination of relevant Eighth Circuit decisions, held that it did not. The court concluded its opinion by noting that its decision was not in conflict with Laramie, supra, because Laramie involved discriminatory application of an ordinance, which plaintiffs in Yellow Bird had not alleged.[2]

The Court in Yellow Bird seems to give Luxon a more narrow interpretation than the case warrants. The plaintiff in Luxon was an enrolled member of the tribe who sought to run for election to the tribal council. The tribal constitution contained a provision barring members of the tribe who worked for the Public Health Service, as did plaintiff, from serving on the council. The District Court had dismissed the case on the grounds urged here—that it lacked jurisdiction to hear cases involving intratribal controversies. The Eighth Circuit reversed and remanded the case for determination of the merits, holding as quoted supra, jurisdiction existed under

2. The Court noted that there was no allegation that plaintiffs had ever applied to the Tribal Council to be enrolled as members, and commented: "The Tribal Council is the constitutionally proper body for determining membership qualifications." Yellow Bird, 380 F.Supp. 438 at 440 (D.S.D.1974). In

the context of the opinion, this does not appear to have been decisive for the trial court and the case is discussed as though it is not. However, to the extent this fact raises the issues of justiciability or exhaustion, those issues will be discussed below.

28 U.S.C. § 1343(4) and 25 U.S.C. § 1302 (8). The Court then stated:

"While we determine that the district court has jurisdiction under 28 U.S.C. § 1343(4) as set forth above, we express no opinion as to whether or not the facts alleged state a proper cause of action or whether, if true, the plaintiff is entitled to judgment on the merits. These determinations should first be made by the district court. As Mr. Justice Black noted in 1946:

Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction." *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)

*Luxon v. Rosebud Sioux Tribe of South Dakota*, 455 F.2d 698, 700 (8th Cir. 1972).

The decision in *Yellow Bird* virtually ignores this distinction.

The Tenth Circuit recently had occasion to comment on the distinction in *Junior Chamber of Commerce, Rochester, New York v. United States Jaycees, Tulsa, Oklahoma*, 495 F.2d 883 (10th Cir. 1974), cert. den., 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974). In that case, the New York group and others had been excluded from affiliation with the defendant Oklahoma group because it allowed women to become group members. The New York group brought an action in federal district court under 42 U.S.C. § 1983, alleging the action of defendants violated their rights under the Fifth and Fourteenth Amendments of the United States Constitution. The trial court granted defendant's motion to dismiss, not for lack of jurisdiction, but for failure to state a claim on the grounds that defendants had failed to show a substantial federal question. The basis for the trial court's decision was in essence that there was insufficient governmental involvement with the organization to subject it to the restrictions of the Fifth and Fourteenth Amendments. On appeal, the Tenth Circuit affirmed the trial court's action, on the basis of *Bell v. Hood*, supra, which it read as mandating dismissal for lack of jurisdiction only if the claim was so insubstantial as to be frivolous, or a mere matter of form, plead solely for the purpose of establishing jurisdiction.

The *Jaycee* case is decisive for the case at bar. The Indian Civil Rights Act is relatively new, and the law concerning its applicability and particularly the effect of the equal protection clause invoked by plaintiffs here is unclear. In view of this and the nature of the claims asserted, they can hardly be characterized as frivolous or a mere matter of form. This court has jurisdiction to decide the case on the merits.

Defendants filed a second motion to dismiss, contending that the case should be dismissed for lack of jurisdiction in light of *McCurdy v. Steele*, 506 F.2d 653 (10th Cir. 1974). The motion was denied. My previous conclusion still stands.

Briefly, *McCurdy* was a declaratory judgment action concerning the validity of write-in votes under the Constitution of the Goshute Tribe. Plaintiffs, candidates in an election for the tribal council, contended that the votes were

not valid, and, therefore, they had won the election. Faced with the questionable write-in votes, the Goshute Election Board had refused to certify any result of the election at all. Plaintiffs had attempted through administrative proceedings to gain recognition of their "election" from the Bureau of Indian Affairs; they were unsuccessful. Contemporaneously, the outgoing Council met and decided a new election should be held. Plaintiffs then filed suit in federal district court. There was, in *McCurdy*, no official tribal position on the question of the validity of write-in votes. Furthermore, as a result of the lawsuit, the second election was never held.

The *McCurdy* case can be viewed in two ways—either as holding that the case presented no justiciable controversy, or as holding tribal remedies and resolutions must be fully exhausted before a federal district court has jurisdiction of a case. Insofar as *McCurdy* is viewed as a justiciability decision, which in my opinion is the correct view in light of the language, the cases are distinguishable, for here there is a clearly expressed, institutionalized tribal position, i. e., the challenged ordinance.

Under the Santa Clara Constitution, the Council has been given both the Legislative and Judicial functions of the Pueblo. In addition, the Constitution, Article II, Section 1, Subsection (c), specifically gives the Council the power to decide what children of "mixed" marriages shall be recognized as members of the Pueblo. The Council in 1939 chose to exercise that power and adopt the ordinance now under attack. Since then, every Council has chosen to enforce, rather than to amend or repeal that Ordinance. The policy of the Pueblo is clear, and the matter has been resolved by the Pueblo—against the plaintiffs.

The case at bar presents a clear "case or controversy" and there is no barrier to jurisdiction under the doctrine of justiciability.

Defendants argue that *McCurdy* holds that a federal district court will not assume jurisdiction unless plaintiff can show she has exhausted all remedies available to her within the tribe. While I do not agree with such a reading, it is certainly true that other courts have held that a plaintiff must exhaust administrative remedies within the tribe, *Clark v. Land and Forestry Committee of the Cheyenne River Sioux Tribe*, 380 F.Supp. 201 (D.S.D.1974), and have recognized the appropriateness of exhaustion of tribal judicial remedies in some circumstances. *White v. Tribal Council, Red Lake Band of Chippewa Indians*, 383 F.Supp. 810 (D.Minn. 1974) (exhaustion required); *Means v. Wilson*, 383 F.Supp. 378 (D.S.D.1974) (exhaustion required); *Hickey v. Crow Creek Housing Authority*, 379 F.Supp. 1002 (D.S.D.1974) (exhaustion required); *O'Neal v. Cheyenne River Sioux Tribe*, 482 F.2d 1140 (8th Cir. 1973) (exhaustion required); *Dodge v. Nakai*, 298 F.Supp. 17 (D.Ariz.1968) (exhaustion not required in the specific instance). The exhaustion of tribal remedies is not a rigid prerequisite to jurisdiction, however, but is to be decided in the specific circumstances presented, taking into account the practical availability of tribal remedies, *Dodge v. Nakai*, supra, and the demands of tribal autonomy, as against the necessity of immediate action to prevent or redress the deprivation of rights guaranteed by the Indian Civil Rights Act. *White v. Tribal Council, Red Lake Band of Chippewa Indians*, supra.

For the decision of this case, it will be assumed, without being decided, that exhaustion of remedies within the Pueblo would be required of these plaintiffs on the facts of this case. Even so, as a factual matter plaintiffs have exhausted all remedies reasonably, or even conceivably available to them.

A detailed summary of the efforts of Julia and Audrey Martinez would fill several pages. For the present, a summary of their activities is sufficient.

Julia Martinez first attempted to have Audrey recognized as a member of the Pueblo in 1946, shortly after Audrey was born.[3] Since 1963 her efforts have been vigorous and constant. Julia Martinez has met with her representative to the Council, to request that he present the request that Audrey be enrolled to the council.[4] When her representative refused to bring the matter up in Council, she obtained special permission from the Governor to address the Council herself. She and other women in her situation have formed a committee which as a group petitioned representatives and, with special permission, the Council. Julia Martinez, individually and with the committee, succeeded in having a special meeting of the entire Pueblo convened to discuss the situation. Julia Martinez, individually and with the committee of similarly situated women attended meetings with various BIA officials, and with the All-Pueblo Agency in Albuquerque. She and her husband Myles attempted to have Myles Martinez naturalized as a member of the Pueblo, in which case their children would have automatically been recognized as members. Mrs. Martinez also met with her State Representative concerning the recognition of her children as members of Santa Clara. Finally Mrs. Martinez attended hearings held by the Subcommittee on Constitutional Rights of the United States Senate Committee on the Judiciary, where she sought the help of then Senator Sam Ervin, Jr. In most instances there has been more than one attempt to resolve the matter through a particular channel; in particular, meetings with the Council representatives, the Governor and the Council have occurred four or five times over the last ten years. Finally, in 1971, Julia and Audrey Martinez sought legal advice. This suit was filed only after attempts by their lawyer to gain recognition for Audrey had failed. Plaintiffs have exhausted all available remedies within the Pueblo.

For the reasons given, I conclude that this Court has jurisdiction of this suit and must proceed to decide the case on its merits.

## MEMORANDUM OPINION

MECHEM, District Judge.

Julia Martinez and her daughter Audrey Martinez bring this suit, each individually and as the representative of a class, against the Santa Clara Pueblo and Governor Lucario Padilla,[1] individually and in his capacity as governor of the Pueblo. Plaintiffs claim that a portion of a tribal ordinance which denies Pueblo membership to the children of female but not male members of the Pueblo who marry non-members of the Pueblo, violates 25 U.S.C. § 1302(8), which prohibits a tribal government in the exercise of its powers of self-government from denying "to any persons within its jurisdiction the equal protection of its laws or depriv[ing] any person of liberty or property without due process of law." Plaintiffs seek an injunction against the further enforcement of the ordinance.

The ordinance, passed in 1939, reads as follows:

> Be it ordained by the Council of the Pueblo of Santa Clara, New Mexico, in regular meeting duly assembled, that hereafter the following rules

---

3. Defendants argued that these efforts were undertaken primarily by Julia Martinez, and that Audrey Martinez has never formally petitioned the Council to enroll her, although as she grew older she has participated in Julia's efforts, ignoring the custom and practice of the Pueblo, that a child should be presented for enrollment by her parent, rather than presenting herself.

4. The By-Laws of the Tribe suggest that individual members of the Pueblo may not di-rectly petition the council, but must have their representative present matters to the council for them. Testimony makes it clear that this is and has been the custom of the tribe.

1. At the time of trial, Paul Tafoya was the duly elected governor of the Pueblo and was sued individually and in his official capacity. Some time after trial, Lucario Padilla was elected Governor and has been substituted as a defendant pursuant to F.R.Civ.P. 25(d).

shall govern the admission to membership to the Santa Clara Pueblo:

1. All children born of marriage between members of the Santa Clara Pueblo shall be members of the Santa Clara Pueblo.

2. All children born of marriage between male members of the Santa Clara Pueblo and non-members shall be members of the Santa Clara Pueblo.

3. Children born of marriage between female members of the Santa Clara Pueblo and non-members shall not be members of the Santa Clara Pueblo.

4. Persons shall not be naturalized as members of the Santa Clara Pueblo under any circumstances.

Plaintiffs attack subparts two and three of the ordinance.

Julia Martinez is a female member of the Santa Clara Pueblo. She is and at all times pertinent to this action was married to Myles Martinez, a Navajo Indian who is not a member of the Pueblo. Plaintiff Audrey Martinez is one of the eight surviving children born to their marriage. Under the 1939 Ordinance, Audrey and the other Martinez children are not recognized as members of the Pueblo. By order previously entered, it has been determined that Audrey Martinez may properly bring this action as the representative of a class consisting of all children born to marriages between Santa Clara women and men who are not members of the Pueblo and that Julia Martinez may properly bring this action as the representative of a class consisting of all women who are members of the Santa Clara Pueblo, and who have married men who are not members of the Santa Clara Pueblo.

Defendant Santa Clara Pueblo is an Indian tribe which has organized and adopted a constitution under the authority of 25 U.S.C. § 476. Defendant Lu-

cario Padilla is the duly elected Governor of the Pueblo and is responsible for enforcing the laws of Santa Clara. Santa Clara Constitution, Article V; Santa Clara By-Laws, Article 1, Section 1.

Jurisdiction exists over this action under 25 U.S.C. § 1302(8) and 28 U.S.C. § 1343(4). The following memorandum shall constitute the Findings of Fact and Conclusions of Law in this case.[2]

The social and political organization of the Pueblo must be discussed first. Santa Clara Pueblo was founded around 1300 A.D. The Pueblo now covers roughly 48,000 acres, held by the United States in trust for the Pueblo. Approximately 1,200 recognized members and between 150 and 200 non-members currently live on the Pueblo. Approximately 150 recognized members live elsewhere, one-third of them in other locations in New Mexico, and the rest scattered across twenty-two different states.

In its early days, Santa Clara culture made no distinction between what Anglo-Americans would term "political" and "religious" matters. However, with the Spanish invasion in the early seventeenth century, the Pueblo instituted a "secular" government to distract Spanish attention from the *caciques* (religious leaders) who were the real authorities in the Pueblo. The distinction between religious and secular spheres is now well established in the Santa Clara culture.

The membership of the Pueblo is and has been organized into what the anthropologists refer to as "moieties", specifically the Winter people and the Summer people. Each moiety is led by a cacique; and each is further divided into factions. The precise function and significance of moiety membership is not clear on the record; it is, however, clear that it is primarily a religious grouping. The caciques are still the dominant authorities in the Pueblo, nominating the candidates for secular

---

2. A discussion of the Conclusion of Law relating to the existence of jurisdiction is contained in an accompanying memorandum filed contemporaneously with this opinion and incorporated herein by reference.

office and exercising an effective veto by influence over the actions of the secular government.

The division of the moieties into factions is a relatively recent development. During the early part of the twentieth century sharp conflicts developed in the Pueblo over the importance of traditional customs and values in the life of the Pueblo. For example, a major source of controversy was whether the Governor should be an older, highly respected man who was well versed in the traditional ways, or a younger man, educated in Anglo-American schools, who could speak English and would be able to deal more effectively with non-Pueblo society. The disagreement literally split the Pueblo, and during the late 1920s and early 1930s the Pueblo had two governors, neither of whom recognized the authority of the other, and two separate Winter and Summer moieties. The Bureau of Indian Affairs (BIA) staff in Washington offered to arbitrate the dispute. The entire Pueblo agreed that the BIA officials from Washington were irrelevant.

The members of the Pueblo did agree to have the resident BIA agent, Elizabeth Sargent, help settle the difference. At her suggestion, and after much discussion, the Pueblo organized pursuant to the authority of the Wheeler-Howard Act, 25 U.S.C. § 476, and adopted a Constitution and By-Laws in 1935. As reorganized the secular government retained many of its traditional institutions, such as the unity of the legislative and "appellate" judicial functions in the Council, while at the same time incorporating and instituting certain Anglo-American institutions, principally voting for secular officials. Thus, the present Pueblo government is neither wholly traditional nor wholly anglicized.

Under the Constitution and By-Laws there is a single governing body, the Council, which possesses both legislative and "appellate" judicial powers. Santa Clara Constitution, Article IV, Sections 1 and 2. The Council consists of the secular officers of the Pueblo—the Governor, the Lieutenant Governor, the Secretary, the Treasurer, the Interpreter, and the Sheriff—and eight representatives. Santa Clara Constitution, Article III, Sections 1 and 5. As a matter of custom and practice, the representatives represent the factions, which still exist.

The Governor is the chief executive of the Pueblo charged with enforcing the law "civil and criminal, written and unwritten." Santa Clara Constitution, Article V; Santa Clara By-Laws, Article 1, Section 1. In addition he appears to have the initial responsibility for settling controversies among and concerning the members of the Pueblo. A person aggrieved by a ruling of the Governor may appeal to the Council, *Id.*, at which time the Governor may vote only to break a tie. Santa Clara Constitution, Article IV, Section 2.

All other secular governmental power and responsibility is vested in the Council, including the power to enact ordinances governing Pueblo life, Santa Clara Constitution, Article IV, Section 1, Subsection 5. Most important for the present case, the Constitution specifically grants the Council the power to determine which children of mixed marriages shall be recognized as members of the Pueblo, Santa Clara Constitution, Article II, Section 2, and to determine who is a member for purposes of dealings in land and land use rights, Santa Clara Constitution, Article VII, Section 1. The 1939 Ordinance was enacted by the Council pursuant to these powers, and is agreed by all parties to be in force at this time.

The factual development of the equal protection claims of the parties is best begun by identifying the interests of plaintiffs and defendants affected or served by the Ordinance.

As previously noted, Audrey Martinez is the daughter of the marriage of plaintiff Julia Martinez, a recognized member of the Pueblo and Myles Martinez, a

non-member of the Pueblo. It is undisputed that the 1939 Ordinance bars recognition of Audrey as a member of the Pueblo. If Myles were a member of the Pueblo and Julia Martinez were not—or if Julia were not married, and Audrey had been born out of wedlock, the Ordinance would not bar her recognition as a member and the Council would in fact so recognize her.

Julia Martinez has lived at the Pueblo all her life, with the exception of a relatively brief absence to further her education. Myles Martinez has lived at the Pueblo ever since his marriage to Julia, with the exception of a relatively brief absence while serving in the armed forces. Audrey Martinez grew up on the Pueblo, although she does leave to pursue her education. Aside from the fact that she is not recognized as a member of the Pueblo and is therefore denied certain rights, she has been raised in the culture of Santa Clara, speaks Tewa, the traditional language, and clearly considers herself to be a Santa Claran.

As a factual matter, recognition as a member of the Pueblo would give Audrey Martinez three distinct types of rights which she is presently denied. First, she would gain political rights, primarily the right to vote, to take matters before the Pueblo Council, and the qualification to hold office as a secular official.

Secondly, she would be entitled to share in the material benefits of Pueblo membership. The most important of the material benefits is that referred to as land use rights. As noted above, title to the Pueblo land is held by the United States in trust for the Pueblo, rather for the individual members of the Pueblo. The Council may designate specific areas of the land to be set aside for the use of particular individuals, Santa Clara Constitution, Article VII, and members of the Pueblo are equally entitled to use land not specifically assigned to an individual. As a matter of custom and practice, these use rights are passed down through fam-

ilies. However, only members of the Pueblo are entitled to use rights; thus in families such as the Martinez family, where the children are not members of the Pueblo, the land use rights cannot be passed on to succeeding generations. In the same manner, Article VII, Section 2 of the Santa Clara Constitution, provides that members may rent or sell their use rights, but again, only to other members. As noted above, the Council has the power under the Constitution to determine who is a member for purposes of land use rights. It is undisputed that since 1939 this determination has been governed by the 1939 Ordinance, although from the Constitution it would appear that the Council could, if it so decided, apply different criteria. Other material benefits and privileges include the right to hunt and fish on the land, the use of irrigation water, and an equal share in any distribution of pecuniary benefits made by the Pueblo, or any other programs, present or future, undertaken by the Pueblo for the benefit of its members.

Third, as members, Audrey and other children similarly situated would as of right be able to continue living at the Pueblo. While it is true that the Martinez family and a number of other families in their position live at the Pueblo, this is not as a matter of right. If and when Mrs. Martinez dies, the rest of the family, as non-members would not have the right to continue living on the Pueblo, though it is not now known whether they would be forced to leave. Furthermore, under the Santa Clara Constitution, Article IV, Section 1, Subsection 5, non-members and only non-members may be expelled from the Pueblo for violating a Pueblo Ordinance.

Lack of membership does not now affect entitlement to federal benefits accorded Indians generally, or participation in the religious life of the Pueblo. In 1968, Mr. and Mrs. Martinez obtained BIA census numbers for their children, and since then the children have received all federal benefits gen-

erally available to Indians, including educational and medical benefits. As to religion, Audrey Martinez is already allowed to participate in Pueblo religious ceremonies to the same extent that she would be if she were a recognized member of the Pueblo. Thus, the question presented is one of membership in the Pueblo for purposes of purely internal, secular, rights and privileges.

Julia Martinez claims that the operation of the Ordinance rendering her children non-members denies her the equal protection of the laws and deprives her of property without due process of law. More specifically, she claims that the Ordinance necessarily restricts her land use rights and other material benefits and rights which she could give to her children if they were recognized as members.

In addition to these relatively precise and legally protectible interests, Julia and Audrey Martinez and many of those similarly situated share a strong emotional involvement with the Pueblo. Regardless of official definitions of membership, Julia Martinez feels that her children, having grown up in Santa Clara, should be recognized as Santa Clarans. Audrey Martinez, despite official definitions, clearly considers herself to be a Santa Clara Indian. While the law may not recognize or protect these interests, it would be foolish to pretend that they do not exist.

While the factual context of the legal claims made by Audrey and Julia Martinez differs, it is clear that both ultimately present the same legal question— whether the 1939 Ordinance violates their rights to equal protection of tribal laws, as secured to them by the Indian Civil Rights Act, 25 U.S.C. § 1302(8).

The specific interests of the Pueblo in membership policies generally and in the particular policy of the 1939 Ordinance are of concern as well. Since 1680 the Pueblo has existed as a conquered people, identifiable as a group but surrounded by an alien culture, first Spanish and later American. From a practical political standpoint, the result has been a tension in the life of the Pueblo between traditional Pueblo customs and values and the "modern" customs and values of Anglo-American society. As noted above, this tension was once so acute that the Pueblo became divided against itself. The differences were eventually resolved by the adoption of the Constitution, which drew upon both traditional Pueblo and modern Anglo-American institutions, synthesizing them into a unique structure neither wholly traditional nor wholly modern.

The function of membership policies must be examined within this context. In *Dodge v. Nakai*, 298 F.Supp. 26 (D. Ariz.1968), the Court dealt with the interest of the Navajo tribe in geographically defining itself, and controlling who could and could not enter the reservation. Membership policies present the same interests on a different level. They are no more or less than a mechanism of social, and to an extent psychological and cultural, self-definition. The importance of this to Santa Clara or to any other Indian tribe cannot be overstressed. In deciding who is and who is not a member, the Pueblo decides what it is that makes its members unique, what distinguishes a Santa Clara Indian from everyone else in the United States. If its ability to do this is limited or restricted by an external authority, then a new definition of what it is to be a Santa Claran is imposed, and the culture of Santa Clara is inevitably changed.

The second major interest served by membership policies, and by the particular policy of the 1939 Ordinance, is that of economic survival of the tribal unit. As plaintiffs have demonstrated, the adoption of the 1939 Ordinance was in response to a sudden increase in mixed marriages, which had resulted in a proportionate strain on the economic resources of the Pueblo. Plaintiffs argue that economic integrity of the Pueblo is less important than cultural autonomy. The difficulty with this po-

sition is that the two are not easily separable. The ability of the Pueblo to control the use and distribution of its resources enhances its ability to maintain its cultural autonomy.

Plaintiffs do not challenge the power of the Pueblo, as delegated to and exercised by the Council, to make and enforce rules concerning membership. Their attack on the Ordinance is solely aimed at the criteria employed as to children of mixed marriages.

At trial the defendants sought to prove that the Ordinance was merely the written embodiment of ancient custom, or alternatively, that the Ordinance regulated membership for religious as well as secular purposes. The Ordinance does not regulate religious as well as political membership. As noted above, Audrey Martinez, although not a recognized member of the Pueblo, is allowed to participate in religious ceremonies to the same extent she would be if she were a member. While there is a relationship between religious life and secular, political life at Santa Clara, the distinction has been clear for nearly four hundred years. The Ordinance neither pertains to religious membership, nor necessarily affects it.

Whether or not the Ordinance is an embodiment of pre-existing ancient Pueblo custom is less clear. Before 1939 mixed marriages were relatively rare in the Pueblo, and consequently there was no need for a hard and fast rule concerning membership; rather, the Council considered each case separately. In that sense, the establishment of any one rule must be seen as a break with tradition.

On the other hand, the criteria employed in classifying children of mixed marriages as members or non-members are rooted in certain traditional values. It appears that Santa Clara was traditionally patrilineal and patrilocal—in other words, that kinship, name and location of residence generally were expected to follow the male rather than the female line. These cultural expectations have lost much of their force, but they are not entirely vitiated. The absentee voter lists of the Pueblo show that in 1971, 148 members of the Pueblo lived elsewhere. Of these, 59 were men and 89 were women. In 1973, 143 members lived elsewhere, of whom 59 were men and 84 were women. Furthermore, it is apparent that membership of the parents and marriage, either within or out of the Pueblo, has always been considered a highly significant factor in membership determinations as opposed to other possible criteria such as degree of Santa Clara ancestry. When a member of the Pueblo married a non-member, the status of children of the marriage was questionable. Consonant with this, children born to an unmarried Santa Clara woman traditionally have been and still are recognized as members, regardless of who the father is or might be.

It is clear that the interests of plaintiffs and defendants in the 1939 Ordinance are vitally important. Indeed, they are fundamentally the same. Both sides have political and property rights which are affected by the Ordinance. Both sides also have a deep psychological and cultural interest in the membership Ordinance which, if not legally quantifiable, cannot be ignored.

Basically " . . . Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their Territory, *Worcester v. Georgia,* 6 Pet. [31 U.S.] 515, 557, 8 L.Ed. 483 (1832); they are 'a separate people' possessing 'the power of regulating their internal and social relations . . .' *United States v. Kagama,* 118 U.S. 375, 381–382, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 173, 93 S.Ct. 1257, 36 L.Ed. 2d 129 (1973)." *United States v. Mazurie,* 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706, 716, 717 (1975). This sovereign power, however, is subject to limitation by Congress; as a practical matter Indian tribes are sovereign only to the extent Congress has

allowed them to remain so. *Worcester v. Georgia,* supra; *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *Native American Church of North America v. Navajo Tribal Council,* 272 F.2d 131 (10th Cir. 1959); *Colliflower v. Garland,* 342 F.2d 369 (9th Cir. 1965); *Groundhog v. Keeler,* 442 F. 2d 674 (10th Cir. 1971); *Seneca Constitutional Rights Organization v. George,* 348 F.Supp. 51 (W.D.N.Y.1972); *United States v. Blackfeet Tribe of Blackfeet Indian Reservation,* 364 F.Supp. 192 (D.Mont.1973); *Lohnes v. Cloud,* 366 F.Supp. 619 (D.N.D.1973). In the specific instance of membership determinations, it is well settled that Congress may, and in some cases, has made membership determinations for purposes of distribution of tribal property under the control of the United States. *Martinez v. Southern Ute Tribe,* 249 F.2d 915, 920 (10th Cir. 1957), cert. den., 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067, reh. den., 357 U.S. 924, 78 S.Ct. 1374, 2 L.Ed. 2d 1376; *Simmons v. Eagle Seelatsee,* 244 F.Supp. 808 (E.D.Wash.S.D.1965), aff'd, 384 U.S. 209, 86 S.Ct. 1459, 16 L.Ed.2d 480. It is equally well settled that, absent Congressional restrictions, an Indian tribe has the power to determine its own membership, at least for purely internal purposes. *Martinez v. Southern Ute Tribe,* supra. Thus, the question presented is to what extent Congress, by enacting 25 U.S.C. § 1302, commonly known as the Indian Civil Rights Act, has exercised its powers of control over membership determinations.

■ Courts faced with the necessity of construing 25 U.S.C. § 1302(8) have consistently held that the equal protection guarantee of the Indian Civil Rights Act is not identical to the constitutional guarantee of equal protection. *Wounded Head v. Tribal Council of Oglala Sioux Tribe,* 507 F.2d 1079 (8th Cir. 1975); *Daly v. United States,* 483 F.2d 700 (8th Cir. 1973); *Lohnes v. Cloud,* supra; *Groundhog v. Keeler,* supra. Instead, the Act and its equal protection guarantee must be read against the back-ground of tribal sovereignty and interpreted within the context of tribal law and custom. *Crowe v. Eastern Band of Cherokee Indians etc.,* 506 F.2d 1231 (4th Cir. 1974); *Means v. Wilson,* 383 F.Supp. 378 (D.S.D.1974). Unfortunately, this principle does not answer questions so much as teach the terms in which they must be asked.

Few courts have been faced with the necessity of deciding specifically what the equal protection clause of the Indian Civil Rights Act means. Although sometimes couched in terms of jurisdictional analysis, it is clear that at a minimum, 25 U.S.C. § 1302(8) requires that existing tribal law be applied with an even hand, rather than being arbitrarily enforced in some cases and not in others, *Crowe v. Eastern Band of Cherokee Indians, Inc.,* supra; *Wounded Head v. Tribal Council of Oglala Sioux Tribe,* supra; *Laramie v. Nicholson,* 487 F.2d 315 (9th Cir. 1973), cert. den. 419 U.S. 871, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974); *Yellow Bird v. Oglala Sioux Tribe,* 380 F.Supp. 438 (D.S.D.1974) (dicta), and that certain aspects of procedural due process, principally notice and a hearing, must be observed in granting or denying benefits, *Crowe v. Eastern Band of Cherokee Indians, Inc.,* supra; *Clark v. Land and Forestry Committee of the Cheyenne River Sioux Tribal Council,* 380 F.Supp. 201 (D.S.D. 1974); *Johnson v. Lower Elwha Tribal Community,* 484 F.2d 200 (9th Cir. 1973); see also *O'Neal v. Cheyenne River Sioux Tribe,* 482 F.2d 1140 (8th Cir. 1973). In addition, it has been held that blood quantum requirements for membership or office holding are valid classifications under the Act, *Daly v. United States,* supra; *Simmons v. Eagle Seelatsee,* supra; despite their questionable validity under constitutional standards of equal protection.

On the other hand, there is authority to the effect that where a tribe has departed from traditional methods of choosing tribal officials and adopted Anglo-American voting procedures, the

equal protection clause of the Act will incorporate the constitutional equal protection standard of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and, if necessary, courts will enforce that standard by ordering reapportionment of tribal voting districts. *White Eagle v. One Feather*, 478 F.2d 1311 (8th Cir. 1973); *Daly v. United States*, supra; *Brown v. United States*, 486 F.2d 658 (8th Cir. 1973); but see *White v. Tribal Council, Red Lake Band of Chippewa Indians*, 383 F. Supp. 810 (D.Minn.1974). Even in this situation, however, the courts have viewed the matter of reapportionment as an aspect of equal enforcement of already existing tribal law, and have refused to interpret the equal protection clause of 25 U.S.C. § 1302(8) in a manner that would require the enfranchisement of a new class of the tribal population, *Wounded Head v. Tribal Council of Oglala Sioux Tribe*, 507 F.2d 1079, 1083 (8th Cir. 1975), on the grounds that such an action would come dangerously close to substituting Anglo-American culture for tribal culture.

■ In light of the legislative history of the Act, and the interpretations given it thus far, it is clear that 25 U.S.C. § 1302(8) should not be construed in a manner that would invalidate a tribal membership ordinance when the classification attacked is one based on criteria that have been traditionally employed by the tribe in considering membership questions. The 1939 Ordinance does not violate the restrictions of 25 U.S.C. § 1302(8), and plaintiffs have not been denied the equal protection of the laws within the meaning of the Indian Civil Rights Act.

Plaintiffs do not suggest that the Indian Civil Rights Act should be interpreted in a manner which would impose an Anglo-American equal protection standard on tribes in derogation of their traditional values. To the contrary, they have consistently argued, as have the defendants, that the Act should be interpreted in such a manner as to pre-serve the cultural identity of Indian tribes in general and of Santa Clara in particular. Plaintiffs instead point out that the sex of the parent who is a member of the Pueblo bears little or no relationship to the strength of the parent's identification with traditional Santa Clara culture or the likelihood that the parent will attempt to pass the traditional cultural values on to the child. They point out, quite correctly, that Audrey Martinez and many other children similarly situated have been brought up on the Pueblo, speak the Tewa language, participate in its life, and are, culturally, for all practical purposes, Santa Clara Indians. On the other hand, there are certainly instances of children whose fathers are members of Santa Clara, but who have been raised far from the Pueblo, who cannot speak the language, who have not participated in the life of the Pueblo, and who know nothing of its values, customs and traditions, yet who are, under the 1939 Ordinance, recognized as members. Plaintiffs contend that this is not only irrational but actively destructive of the cultural identity of the Pueblo.

■ Even assuming plaintiffs are correct, the equal protection guarantee of the Indian Civil Rights Act should not be construed in a manner which would require or authorize this Court to determine which traditional values will promote cultural survival and therefore should be preserved and which of them are inimical to cultural survival and should therefore be abrogated. Such a determination should be made by the people of Santa Clara; not only because they can best decide what values are important, but also because they must live with the decision every day. Obviously they can and should be the judges of whether a particular rule is beneficial or inimical to their survival as a distinct cultural group.

■ Much has been written about tribal sovereignty. If those words have any meaning at all, they must mean that a tribe can make and enforce its decisions

without regard to whether an external authority considers those decisions wise. To abrogate tribal decisions, particularly in the delicate area of membership, for whatever "good" reasons, is to destroy cultural identity under the guise of saving it. Congress has not indicated that it intended the Indian Civil Rights Act to be interpreted in such a manner.

Judgment will be entered in accordance with this opinion.