# Tribal Restrictions on Sharing of Indigenous Knowledge on Uses of Biological Resources

The Indian Civil Rights Act, rather than the federal Constitution, limits the power of an Indian tribe vis-à-vis its members. In interpreting provisions of the ICRA, it is appropriate to look to precedents under analogous constitutional provisions constraining federal and state action, although particular facts about tribal structure and traditions may be relevant to the analysis.

In some factual circumstances, a tribal ordinance prohibiting members from sharing, with researchers or others outside the tribe, information on possible commercial uses of biological resources would raise concerns under the free speech provision of the ICRA. The legality of such an ordinance would depend on a number of factors including how widely known the information is; whether those who hold the information have a particular relationship of trust with the tribe; the magnitude of the tribal interest underlying the tribe's effort not to disclose the information; and whether the information can be viewed as tribal property under an intellectual property regime that is otherwise consistent with applicable law.

October 12, 1999

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
ENVIRONMENT AND NATURAL RESOURCES DIVISION

This memorandum responds to the Environment and Natural Resources Division's request, conveyed orally, for guidance on whether an Indian tribe's efforts to prevent its members from disclosing, to researchers or others outside the tribe, information on possible commercial uses of biological resources would raise First Amendment or other concerns. As discussed below, the request raises several complex issues that cannot be resolved fully in the abstract. We therefore attempt only to set forth the general framework that might guide the analysis of a tribal restriction on members' ability to share information with outside researchers. First, the Indian Civil Rights Act ("ICRA"), 25 U.S.C. §§ 1301–1341 (1994), rather than the federal Constitution, limits the power of an Indian tribe vis-à-vis its members. Although the ICRA contains a free speech clause similar to that of the First Amendment, it is unclear whether a tribal action limiting the speech of tribal members would be evaluated under the same substantive standards as federal and state action. The task of interpreting the ICRA falls primarily to tribal courts. We have not attempted to survey the decisions of the varied tribal court systems to determine how tribal courts interpret the ICRA's substantive guarantees. Second, even if conventional free speech principles apply, the legality of tribal action could depend upon factual circumstances likely to vary from tribe to tribe. In particular, the analysis could turn in part on the relationship between the tribe and those who hold the relevant information, whether the information in question should be viewed as tribal property, and the importance of the tribal interest in nondisclosure. We are not in a position to identify and evaluate the range of possibilities in this regard. In some factual circumstances, however, it is possible that a tribe's

235

attempt to guard against disclosure of information by directly prohibiting its members from sharing that information with others would violate the free speech provision of the ICRA.

## I. Background

The request for views presented arises in connection with the United States' involvement in implementation of the Convention on Biological Diversity, *opened for signature* June 5, 1992, S. Treaty Doc. No. 103–20, 31 I.L.M. 818 (entered into force Dec. 29, 1993). The United States signed the Convention on June 4, 1993, but the Senate has not ratified it. The United States is involved as an observer in international negotiations concerning the implementation of the Convention. Article 8(j) of the Convention addresses indigenous knowledge of uses of biological resources. It provides:

Each Contracting Party shall, as far as possible and as appropriate:

. . .

j. Subject to its national legislation, respect, preserve and maintain knowledge, innovations and practices of indigenous and local communities embodying traditional lifestyles relevant for the conservation and sustainable use of biological diversity and promote their wider application with the approval and involvement of the holders of such knowledge, innovations and practices and encourage the equitable sharing of the benefits arising from the utilization of such knowledge, innovations and practices.

An interagency working group discussing the United States' position on implementation of Article 8(j) has raised the question whether federal law imposes limits upon indigenous communities' own efforts to protect indigenous knowledge through direct restrictions on members' ability to reveal such knowledge to outside researchers.[1] In turn, you have asked us to provide you with a general background discussion on the possible impact of the First Amendment on such restrictions.

---

[1] We express no view on whether and to what extent our discussion of the narrow question presented to us bears upon compliance with the obligations imposed by Article 8(j) of the Convention.

## II. Discussion

### A.

As a general matter, constitutional provisions limiting the actions of federal and state governments do not constrain Indian tribes exercising inherent powers of self-government. *See Talton v. Mayes*, 163 U.S. 376 (1896). Accordingly, the First Amendment ordinarily would not restrict a tribe's efforts to prohibit its members from sharing information concerning uses of biological resources with researchers. *See Native American Church of North America v. Navajo Tribal Council*, 272 F.2d 131, 134 (10th Cir. 1959) (First Amendment religion clauses do not constrain tribal action); *Janis v. Wilson*, 385 F. Supp. 1143, 1149 (D.S.D. 1974) (First Amendment Free Speech Clause does not constrain tribal action); *Dodge v. Nakai*, 298 F. Supp. 17, 23 (D. Ariz. 1968) (same).[2] Through title I of the Indian Civil Rights Act,[3] however, Congress has imposed upon tribes restrictions similar to several of those contained in the Bill of Rights and the Fourteenth Amendment. *See* 25 U.S.C. §§ 1301–1303. The Act includes a provision parallel to the Free Speech, Assembly, and Petition Clauses of the First Amendment: "No Indian tribe in exercising powers of self-government shall . . . make or enforce any law . . . abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble and to petition for a redress of grievances." 25 U.S.C. § 1302(1).

In analyzing the application of title I of the ICRA to tribal efforts to guard against disclosure of indigenous knowledge, we first consider a threshold question: whether, in evaluating tribal action, it is appropriate to look to precedents under analogous constitutional provisions constraining federal and state action. As will become clear, the text, structure, and legislative history of the ICRA give rise to two lines of argument regarding its interpretation. Because the task of interpreting the ICRA falls primarily to tribal courts, it is difficult to predict whether

---

[2] For purposes of our discussion, we assume that the tribal conduct would be independent of federal or state action. In instances in which tribal action is closely intertwined with federal or state action, a different analysis might apply For example, particular facts and circumstances might give rise to the conclusion that tribal action is somehow attributable to the federal or state governments *See, e g, Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) In addition, although the Supreme Court has held that in some circumstances the Constitution may constrain the conduct of a private entity on privately owned property-in particular, where a company owns a town and assumes the functions of a municipal government-this principle has been narrowly applied *Compare Marsh v. Alabama*, 326 U.S. 501, 509 (1946) (invalidating state conviction for distribution of religious literature on sidewalk of company-owned town' "In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute ") *with Hudgens v NLRB*, 424 U S 507, 518 (1976) (rejecting application of *Marsh* to shopping center). We are aware of no instance in which *Marsh* has been invoked to support the application of the Constitution to tribal conduct

[3] The Indian Civil Rights Act was initially passed by the Senate on December 7, 1967, as a stand-alone measure containing six titles S 1843, 90th Cong., 113 Cong Rec. 35,471, 35,473 (1967) (as amended). The bill was ultimately enacted as titles II through VII of a larger civil rights measure, the Civil Rights Act of 1968, Pub. L 90–284, 82 Stat. 73, 77. We refer to the title designations in S 1843, as have courts construing the statute *See Santa Clara Pueblo v Martinez*, 436 U.S. 49, 51 n.1 (1978); *Poodry v Tonawanda Band of Seneca Indians*, 85 F.3d 874, 881 n 9 (2d Cir.), *cert. denied*, 519 U S 1041 (1996).

tribal action would be analyzed under the standards that apply to federal and state action. Nevertheless, we believe that the better view is that conventional First Amendment principles, applied with due regard for tribal traditions and customs, should govern the analysis of a tribal restriction on speech.

As the Supreme Court stated in *Santa Clara Pueblo v. Martinez*, the Indian Civil Rights Act reflects Congress's intent to "strengthen[ ] the position of individual tribal members vis-à-vis the tribe." 436 U.S. at 62. As noted, the text of the free speech clause of § 1302(1) is virtually identical to that of the First Amendment, just as other provisions of title I of the ICRA track the language of other guarantees contained in the Bill of Rights. It could be argued, then, that Congress's use of language virtually identical to that of corresponding constitutional provisions reflects a clear intent to hold tribal governments to the substantive standards applied to federal and state action. The Senate Report accompanying the ICRA provides some support for this view. S. Rep. No. 90–841, at 6 (1967) (stating that the limitations of title I "are the same as those imposed on the Government of the United States by the U.S. Constitution and on the States by judicial interpretation"); *id.* at 10–11 (Title I "provides that any Indian tribe in exercising its powers of local self-government shall, with certain exceptions, be subject to the same limitations and restraints as those which are imposed on the Government of the United States by the Constitution.").

Nevertheless, title I of the ICRA does not impose on tribal governments the full range of constitutional restraints. Rather, the statute incorporates specific rights. Among the constitutional provisions omitted in the statute are the guarantee of a republican form of government, a prohibition on the establishment of religion, and the Second and Third Amendments. In addition, the statute does not require jury trials in civil cases or the appointment of counsel for indigent defendants in criminal cases. The ICRA's legislative history confirms that, in incorporating particular rights rather than all constitutional restraints, Congress sought to limit the extent of its intrusion upon tribal sovereignty. As the Supreme Court stated in *Santa Clara Pueblo*, Congress sought "to promote the well-established federal 'policy of furthering Indian self-government.'" 436 U.S. at 62 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Indeed, the first version of what would become title I of the ICRA, introduced in 1964 and reintroduced without change in 1965, would have applied to tribal governments the "same limitations and restraints as those which are imposed on the Government of the United States by the United States Constitution." S. 3047, 88th Cong., 110 Cong. Rec. 17,329 (1964); S. 961, 89th Cong., 111 Cong. Rec. 1799 (1965). Tribes, attorneys specializing in Indian affairs, and the Department of the Interior criticized this proposal during 1965 hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary. *Constitutional Rights of the American Indian: Hearings on S. 961–968 and S.J. Res. 40 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 89th Cong. 17–18, 36, 84, 90, 130,

221–27 (1965) ("1965 Hearings"); Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 89th Cong., *Constitutional Rights of the American Indian* 9 (Comm. Print 1966) ("1966 Report"). A revised version of S. 961, introduced in 1967 as S. 1843, largely followed a proposal offered by the Department of the Interior at the 1965 hearings that incorporated, and in some cases modified, specific constitutional rights. 113 Cong. Rec. 13,473 (1967). With some changes in wording not relevant here, S. 1843 and several other measures were consolidated into a single bill, *see* S. 1843, 90th Cong., § 102, 113 Cong. Rec. 35,471 (1967) (as amended), and enacted as part of a broader civil rights measure. *See* 113 Cong. Rec. 30,711 (1967); 114 Cong. Rec. 5835 (1968).

Based on the fact that Congress sought to limit its intrusion on tribal sovereignty, some commentators have argued that constitutional precedents should not apply even as to provisions of the ICRA that are worded similarly to constitutional guarantees. *See* Note, *The Indian Bill of Rights and the Constitutional Status of Tribal Governments*, 82 Harv. L. Rev. 1343, 1359 (1969) ("Indian Bill of Rights"); Donald L. Burnett, Jr., *An Historical Analysis of the 1968 'Indian Civil Rights' Act*, 9 Harv. J. on Legis. 557, 617 (1972). The fact that Congress deleted certain restrictions on governmental activity, these commentators suggest, signals Congress's effort to avoid imposing requirements that would cause serious disruption of tribal life, not Congress's intent "to force modifications of tribal ethnic and cultural autonomy where necessary for the application of those restrictions on governmental conduct which remain in the statute." Indian Bill of Rights at 1359.

Federal case law provides little additional guidance as to whether those provisions that Congress chose to include in the ICRA should be interpreted in the same manner as corresponding constitutional provisions. In *Santa Clara Pueblo*, the sole Supreme Court case directly addressing the structure, purpose, and legislative history of the ICRA, the Court held that federal courts lacked jurisdiction to entertain a civil cause of action against a tribe or its officials alleging a violation of title I of the ICRA. 436 U.S. at 67–68. Accordingly, because the Court disposed of the case on jurisdictional grounds, the Court had no opportunity to consider the scope of the Act's substantive guarantees. The Court's jurisdictional discussion nevertheless reflects the importance of applying the ICRA with sensitivity to tribal customs and traditions. *See id.* at 63 (noting that the ICRA as a whole manifests "a congressional purpose to protect tribal sovereignty from undue interference"); *id.* at 71 ("Congress may also have considered that resolution of statutory issues under § 1302, and particularly those issues likely to arise in a civil context, will frequently depend on questions of tribal tradition and custom which tribal forums may be in a better position to evaluate than federal courts.").

Since the Court's 1978 ruling, only a handful of federal courts have addressed, in the criminal context, the scope of ICRA's substantive guarantees in relation

to similarly worded constitutional provisions.[4] Prior to the decision in *Santa Clara Pueblo*, a number of federal courts had exercised jurisdiction over civil claims arising under ICRA and had interpreted the Act's substantive guarantees in a variety of ways. We discuss these categories of cases in turn.[5]

Recent federal decisions addressing claimed violations of title I of the ICRA typically involve habeas review of a tribal court conviction or direct or collateral review of a federal conviction that followed certain challenged tribal investigatory conduct, such as a search or arrest. In cases involving tribal prosecution or investigation of criminal conduct, most courts have concluded that Congress's use of constitutional language in title I of the ICRA reflects an intent to apply to tribal governments the substantive standards that apply under the Constitution to federal and state action. *See, e.g., Selam v. Warm Springs Tribal Correctional Facility,* 134 F.3d 948, 952 (9th Cir. 1998) ("[B]ecause the ICRA [compulsory process] clause is identical to the Compulsory Process Clause of the Sixth Amendment, the cases that interpret the Constitution speak directly to Selam's right of compulsory process under the ICRA."); *United States v. Strong,* 778 F.2d 1393, 1397 (9th Cir. 1985) (noting that the limitations imposed by the ICRA search and seizure provision "are identical to those imposed by the fourth amendment to the federal constitution"); *United States v. Lester,* 647 F.2d 869, 872 (8th Cir. 1981) ("In light of the legislative history of the Indian Civil Rights Act and its striking similarity to the language of the Constitution, we consider the [challenge to a tribal search] under fourth amendment standards.") (citation omitted); *United States v. Clifford,* 664 F.2d 1090, 1091 n.3 (8th Cir. 1981) (same); *see also Poodry v. Tonawanda Band of Seneca Indians,* 85 F.3d at 893 & n.21 (concluding that the ICRA's habeas remedy is coextensive with other federal statutes providing for collateral relief). *But see United States v. Doherty,* 126 F.3d 769, 779 (6th Cir. 1997) (finding denial of right to retained counsel in tribal court proceeding, but declining to suppress confession because to do so would upset the "careful[ ] balance[ ]" between "the desire to protect the rights of Native Americans [and] the desire to avoid extensive interference with internal tribal affairs"), *cert. denied,* 524 U.S. 917 (1998).

Pre-*Santa Clara Pueblo* decisions applying the provisions of title I outside of the criminal context (that is, based on the now rejected assumption that the ICRA impliedly provided for a civil cause of action in federal courts against tribal officials) reflect less consensus on the scope of the ICRA's substantive guarantees.

---

[4] The Tenth Circuit has recognized an exception to the rule announced in *Santa Clara Pueblo* and has permitted federal court adjudication of certain civil actions in cases in which no tribal remedy exists. *Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes,* 623 F.2d 682, 685 (10th Cir 1980), *cert. denied,* 449 U S 1118 (1981). We do not address cases falling within this exception, which has been rejected by at least two other circuits, *see Shortbull v. Looking Elk,* 677 F 2d 645 (8th Cir.), *cert. denied,* 459 U.S. 907 (1982), *R.J. Williams Co. v. Fort Belknap Hous Auth.,* 719 F.2d 979, 981 (9th Cir. 1983), *cert. denied,* 472 U.S 1016 (1985), and narrowed by the Tenth Circuit itself, *see White v Pueblo of San Juan,* 728 F.2d 1307, 1311–12 (10th Cir. 1984).

[5] As noted above, we do not attempt to discuss tribal court decisions regarding the scope of the ICRA's substantive guarantees

Some courts recognized that Congress did not intend to apply the full panoply of constitutional restrictions to tribes but reasoned that, as to those provisions in which Congress adopted wording virtually identical to that of a constitutional guarantee, existing constitutional precedents should apply. *See Red Fox v. Red Fox,* 564 F.2d 361, 364 (9th Cir. 1977) ("The Act substantially tracks the precise language of the Bill of Rights portion of the Constitution, thereby acting as a conduit to transmit federal constitutional protections to those individuals subject to tribal jurisdiction. . . . [O]ur court has written that the due process clauses of both documents have the same meaning.") (citing *Johnson v. Lower Elwha Tribal Community,* 484 F.2d 200, 202–03 n.4 (9th Cir. 1973)). Others concluded that constitutional precedents applicable to federal and state governments did not apply with full force to tribes, even as to provisions with language closely tracking the Constitution. *See, e.g., Wounded Head v. Tribal Council of Oglala Sioux Tribe,* 507 F.2d 1079, 1082 (8th Cir. 1975) (concluding that the equal protection clause of the ICRA should not be construed in the same manner as the Equal Protection Clause of the Fourteenth Amendment); *Groundhog v. Keeler,* 442 F.2d 674, 682 (10th Cir. 1971) (rejecting claim that the passage of the ICRA made the Due Process and Equal Protection Clauses applicable to tribes); *Lohnes v. Cloud,* 366 F. Supp. 619, 622 (D.N.D. 1973) (following *Groundhog*).[6] In a third category of cases, courts held that federal precedents apply under the ICRA so long as the challenged policy does not reflect a long-standing tribal tradition. *See Howlett v. Salish & Kootenai Tribes,* 529 F.2d 233, 239 (9th Cir. 1976) (applying "the Anglo-Saxon notion of equal protection" to election and voting procedures based on those "found in our culture" (internal quotation marks omitted)); *Means v. Wilson,* 522 F.2d 833, 842 (8th Cir. 1975) (applying traditional constitutional principles to practice that "is not founded [on a] tribal custom or governmental purpose which would justify modification of traditional equal protection concepts"), *cert. denied,* 424 U.S. 958 (1976); *White Eagle v. One Feather,* 478 F.2d at 1314 (applying traditional equal protection principles to evaluate compliance with "voting procedures precisely paralleling those commonly found in our culture").

---

[6] Several cases in this category follow *Groundhog,* which is based on an incomplete analysis of the ICRA's legislative history The Department of Interior's proposed equal protection provision would have guaranteed "any member of the tribe" within the jurisdiction of the tribal government equal protection under the tribe's laws, a standard narrower than that of the Fourteenth Amendment. 1965 Hearings at 318. A summary report of the Subcommittee on Constitutional Rights of the Senate Judiciary Committee recommended adoption of the Interior substitute and stated that the substitute would "impose upon the Indian governments the same restrictions applicable presently to the Federal and State governments with several notable exceptions," including, "in some respects, the equal protection requirement of the 14th amendment." 1966 Report at 25. The version of the bill described in the report was amended prior to being voted out of the full Judiciary Committee to guarantee "any person" located within the tribe's jurisdiction equal protection under the tribe's laws, S Rep. No. 90–841, at 2, thereby making the scope of the clause commensurate with that of the Fourteenth Amendment. Without acknowledging the subsequent amendment by the full committee, the *Groundhog* court relied on the report's statement to conclude that "the equal protection clause in § 1302(8) of the Indian Bill of Rights was not as broad as the equal protection clause of the Fourteenth Amendment." 442 F.2d at 682. Courts subsequently quoted the *Groundhog* court's analysis without independently evaluating the legislative history. *E.g., Wounded Head,* 507 F 2d at 1082, *White Eagle v. One Feather,* 478 F.2d 1311, 1313 (8th Cir. 1973); *Lohnes,* 366 F Supp at 622.

Although courts have disagreed over the extent to which provisions of the ICRA should be interpreted in the same manner as their constitutional counterparts, we believe that the better view is that conventional constitutional principles should generally apply where the language of title I of the ICRA closely tracks that of the Constitution. To be sure, the discussion in *Santa Clara Pueblo* suggests that title I of the ICRA must be interpreted with sensitivity to tribal customs and traditions. *See supra* pp. 238–39; 436 U.S. at 63, 71. Congress sought to limit its intrusion on tribal sovereignty by selecting specific rights to include in the ICRA. Congress did not, however, simply identify those rights in concept and formulate specific language for the tribal context. Rather, in many cases it imported the precise constitutional language in an effort to impose upon tribes, "with certain exceptions," "the same limitations and restraints as those which are imposed on the Government of the United States by the Constitution." S. Rep. No. 90–841, at 10–11. Generally speaking, recent federal cases arising in the criminal context have applied to tribal governments the same substantive standards that apply under the Constitution to federal and state action. Although earlier cases reflected less consensus, it appears that a number of cases holding that constitutional standards do not apply can be traced to a case based on an incomplete discussion of the ICRA's legislative history. *See supra* note 6. We attempt below to set forth certain principles of First Amendment law that might guide the analysis of a tribal ordinance challenged under § 1302(1) of the ICRA, and to identify areas in which tribal structure and traditions would be relevant to the analysis.

B.

A tribal ordinance restricting the dissemination of information concerning biological resources would, in effect, limit the speech of those members of a tribe who wished to share the information with others. How such an ordinance should be evaluated under conventional free speech doctrine would depend in part on two related considerations that could vary from case to case: first, how best to describe the relationship between the tribe and holders of the information that the tribe seeks to protect; and second, whether the information in question can properly be viewed as tribal proprietary information. To frame the analysis, we first assume (1) that it is appropriate to think of the relationship between the tribe and its members as roughly analogous to the relationship between a state government and its citizens; and (2) that the restriction on the dissemination of information applies to information that is not properly viewed as tribal property under federal or other law. We then discuss how the analysis might change if we relax these assumptions.

1. If the relationship between a tribe and its members should be thought of as analogous to the relationship between a state and its citizens, and a tribe seeks to limit the dissemination outside of the tribe of lawfully obtained information

that is not tribal property, it is doubtful that the tribal restriction would survive scrutiny under conventional free speech principles. The Supreme Court has held on several occasions that "the Government may not generally restrict individuals from disclosing information that lawfully comes into their hands in the absence of a state interest of the highest order." *United States v. Aguilar*, 515 U.S. 593, 605 (1995) (internal quotation marks omitted); *see Florida Star v. B.J.F.*, 491 U.S. 524, 533 (1989) (setting aside award of compensatory and punitive damages against newspaper that published rape victim's name, in violation of Florida law, after obtaining it from police document); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979) (affirming writ of prohibition against prosecution of newspaper that published name of youth involved in juvenile proceeding, in violation of West Virginia law); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 845–46 (1978) (reversing conviction of corporate newspaper publisher that revealed identity of judge under investigation in confidential state proceedings, where newspaper was not alleged to have obtained the information by illegal means); *Oklahoma Publ'g Co. v. Oklahoma County Dist. Court*, 430 U.S. 308, 311 (1977) (per curiam) (invalidating state pretrial order enjoining publication of the name of juvenile in connection with a proceeding involving that juvenile and attended by reporters); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 471 (1975) (invalidating civil damages award entered against television for broadcasting name of a rape-murder victim that the station obtained from courthouse records). The fact that the information in question might not otherwise be widely available to the public does not appear to change the First Amendment's limitations on the government's ability to prevent further dissemination. *See, e.g., Landmark; see also New York Times Co. v. United States*, 403 U.S. 713 (1971) (refusing to restrain third parties' publication of classified study secured by unauthorized leak from former government employee).

*Florida Star* and similar cases do leave open the possibility that, in rare circumstances, the First Amendment might not bar sanctions on the publication or dissemination of true, lawfully obtained information. We lack the expertise regarding tribal affairs, however, to speculate whether such a weighty justification may exist in this context. *Cf. Near v. Minnesota*, 283 U.S. 697, 716 (1931) (invalidating, as prior restraint, statute permitting suppression of malicious, scandalous, or defamatory periodicals; noting that, in exceptional cases, statute restraining publication might survive scrutiny, as where publication would reveal troop movements or obstruct recruitment of soldiers during a time of war or incite acts of violence (citing *Schenck v. United States*, 249 U.S. 47, 52 (1919)). We may be unaware of facts regarding indigenous knowledge that could trigger such an exception. It may be relevant, for example, whether the tribe seeks to limit the dissemination of information outside of the tribe for compelling religious or cultural reasons or instead to profit from future arrangements with researchers or manufacturers.

243

2. If the relationship between the tribe and those who hold knowledge concerning the use of biological resources should not be thought of as analogous to that between a government and its citizens, the analysis reflected in *Florida Star* and similar cases may not apply. The cases discussed above do not involve restrictions on the dissemination of information by one who, by virtue of a fiduciary or other relationship with the government, is under a duty not to disclose particular information to the public. Case law suggests that the government may lawfully limit disclosure of sensitive or confidential information by an individual who assumes a position of trust. In *Aguilar*, for example, the defendant, a district court judge, learned of a confidential wiretap order and disclosed the existence of the order to its target after its expiration. In rejecting the defendant's claim that the statute prohibiting disclosure of wiretap information should, on First Amendment grounds, be construed not to cover the judge's revelation of an expired order, the Court stated: "Government officials in sensitive confidential positions may have special duties of nondisclosure. . . . As to one who voluntarily assumed a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public." 515 U.S. at 606 (citations omitted). Similarly, in *Snepp v. United States*, 444 U.S. 507 (1980) (per curiam), the Court held that a former agent of the Central Intelligence Agency ("CIA") had, by virtue of his employment contract, a fiduciary duty not to disclose any information regarding the CIA or its activities without the CIA's prior permission. The former agent breached this duty by publishing confidential (though unclassified) information without prior approval. The Court rejected the view that the CIA's pre-publication review procedure constituted impermissible censorship of its employees' speech. *See* 444 U.S. at 513 n.8. In addition, the Court observed that,

> even in the absence of an express agreement . . . the CIA could have acted to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment. The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.

*Id.* at 509 n.3 (citations omitted).

*Aguilar* and *Snepp* suggest that, in some circumstances, the relationship between the government and one who possesses certain information will be a relationship of trust, and that the government may, in pursuit of a substantial government interest, reasonably impose upon an individual who enters into that relationship

a duty not to disclose information obtained by virtue of that relationship. Although it is not clear that the relationship between a tribe and those who hold information concerning use of biological resources would ordinarily be the sort of relationship that would give rise to a duty of confidentiality, we may be unaware of particular facts, including facts about tribal structure and culture, that would bear upon the analysis. For example, it may be relevant whether information is held solely by tribal elders or members of a ruling entity, as opposed to being known more widely throughout the tribe. In addition, we may be unaware of a substantial or compelling tribal interest that would support a requirement of nondisclosure.

3. We have thus far assumed that information on uses of biological resources would not properly be viewed as tribal intellectual property, and we have identified limitations that the ICRA's free speech clause might impose upon a tribe's ability to restrict the dissemination of such information. If the information were properly viewed as tribal property, it is likely that a tribe could lawfully impose some restrictions upon the dissemination of that information. The possibility that information on uses of biological resources could be treated as tribal property, however, raises a prior question: whether the recognition of a tribal property interest would itself be consistent with applicable law. We first consider the limitations that federal law would impose on the creation or recognition of a tribal property interest in information on uses of biological resources. We then examine whether a tribe could invoke current federal or state intellectual property law to establish a tribal property interest in such information.

a. There are two possibilities for recognition of a property interest in information on uses of biological resources: first, that *federal or state law* would create or recognize, on behalf of a tribe, a property interest in information on uses of biological resources; and second, that *tribal law* would create such an interest.

A federal or state regime that created or recognized a tribal property interest in information on uses of biological resources-as distinct from the tribe's action to enforce its rights under that regime-would be subject to scrutiny under the First Amendment (or, in the case of a state, the First and Fourteenth Amendments), rather than under the ICRA. While the precise limits that the First Amendment imposes upon the ability of the government to provide protection for the intellectual property of its citizens are somewhat unclear, *see generally* Diane L. Zimmerman, *Information as Speech, Information as Goods: Some Thoughts on Marketplaces and the Bill of Rights*, 33 Wm. & Mary L. Rev. 665 (1992), we can make some general observations.

First, the Supreme Court has permitted the government to recognize a property interest in information and to prevent its dissemination when the information is confidential and has been provided to another on the express condition that it not be further disclosed. For example, the Court has recognized that a state may protect trade secrets by allowing one who discovers a formula or process to pre-

vent those privy to the relevant information from disclosing it to others. *See Kewanee Oil Co. v. Bicron Corp*, 416 U.S. 470, 479, 486 (1974).[7]

Second, to the extent that the Supreme Court has permitted the government to recognize and protect a property right for exclusive use of a particular process, performance, or formula, it has done so where the party seeking protection can establish that it devoted energy and resources to developing that process, performance, or formula. Thus, for example, in *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522 (1987), the Supreme Court rejected a First Amendment challenge to a federal statute granting the United States Olympic Committee the exclusive right to use the word "Olympic" in connection with the sale of any goods and services or the promotion of any exhibition, performance, or competition. The Court concluded that Congress's grant of an exclusive right to use the word "Olympic" was consistent with the recognition that, "when a word acquires value 'as the result of organization and the expenditure of labor, skill, and money' by an entity, that entity constitutionally may obtain a limited property right in the word." *Id.* at 532 (quoting *International News Serv. v. Associated Press*, 248 U.S. 215, 239 (1918)). Similarly, in *Zacchini v. Scripps-Howard Broadcasting Co.*, the Court held that the First Amendment, applied to the states through the Fourteenth Amendment, did not prohibit a state from protecting a performer's right to the value of his performance by providing a cause of action for damages against those who broadcast his act without his consent. In rejecting a news organization's claim that the First and Fourteenth Amendments required the state to recognize a privilege to include in its newscasts material that would otherwise be protected under state law, the Court emphasized that the performance

> is the product of petitioner's own talents and energy, the end result of much time, effort, and expense. . . . Ohio's decision to protect petitioner's right of publicity here rests on more than a desire to compensate the performer for the time and effort invested in his act; the protection provides an economic incentive for him to make the investment required to produce a performance of interest to the public. This same consideration underlies the patent and copyright laws long enforced by this Court.

---

[7] Although no First Amendment claim was presented in *Kewanee*, the Court's reliance on *Kewanee* in disposing of a First Amendment claim in *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977), suggests that the Court would uphold a trade secret law against a First Amendment challenge. *See id.* at 578 n.13 (noting that, in *Kewanee*, "[a]lthough recognizing that the trade-secret law resulted in preventing the public from gaining certain information, the Court emphasized that the law had 'a decidedly beneficial effect on society,' and that without it, 'organized scientific and technological research could become fragmented, and society, as a whole, would suffer' ") (quoting *Kewanee*, 416 U.S. at 485, 486).

433 U.S. at 575–76.[8]

As this discussion suggests, a tribe's ability to use recognition of an intellectual property right as a tool for preventing the dissemination of information on uses of biological resources may turn on the extent to which the information sought to be protected is not generally available and the extent to which the tribe itself can be said to have developed the information in question. A private entity seeking intellectual property protection, for example, could demonstrate that it sponsored employee efforts leading to a particular innovation and went to reasonable efforts to prevent those privy to the relevant information from disseminating it. It is unclear whether a tribe seeking recognition of an intellectual property right in knowledge of uses of biological resources could establish that the tribe-rather than individual members of the tribe-was responsible for the development of the information or process that it seeks to protect, or that the information is not generally known. Again, there may be particular facts of which we are unaware that would bear on this analysis. For example, it. may not be accurate to characterize the contribution of a member of a tribe to the development of a particular process as an individual rather than tribal contribution.

We turn now to whether a tribe itself could establish an intellectual property regime to protect information on uses of biological resources and thereby restrict dissemination of such information. As in the case of direct tribal limitations on speech, the principal question is whether title I of the ICRA would constrain the tribe's conduct. For purposes of discussion, we assume that tribes retain the power to recognize and enforce property rights of those within the tribe's sovereign reach and that tribes can exercise this power to the extent that it does not conflict with federal law in this area. *Cf. Kewanee*, 416 U.S. at 479 (discussing limits on state regulation of intellectual property). If conventional free speech principles apply to tribal action in this context, then the analysis of a tribal regime under the ICRA would follow that outlined above with respect to federal or state protection of intellectual property. If, however, the tribe sought not to enforce the property rights of those within its reach, but instead to vest a property right in itself, its action could raise additional concerns under the ICRA. First, insofar as the ICRA envisions the tribe as a sovereign-like entity, it is unlikely that the ICRA's free speech clause would permit a tribe simply to deem information to be tribal information so as to prevent its dissemination, just as the First Amendment would not permit the federal government or a state to deem particular information, generally known within its jurisdiction, to be confidential government information solely in order to prevent its dissemination. Second, the ICRA also prohibits an Indian tribe, "in exercising powers of self-government," from "tak[ing] any private property for a public use without just compensation." 25 U.S.C. § 1302(5).

---

[8] For a more detailed discussion of potential First Amendment limitations on the government's ability to recognize intellectual property rights in information, *see generally Constitutional Concerns* Raised by the Collections of Information Antipiracy Act, 22 Op O L C 166, 186–190 (1998)

To the extent that the development of knowledge concerning uses of biological resources is attributable to an investment of resources by individual members of the tribe rather than the tribe itself, and to the extent that it is appropriate to characterize such contributions as individual contributions, the tribe's action could raise concerns under the ICRA's takings clause.

b. Having outlined the restraints that federal law would impose on recognition of a property interest in information on uses of biological resources, we briefly examine the possibilities for such protection under existing federal and state intellectual property regimes. It does not appear that a tribe could invoke current federal or state intellectual property law to establish a tribal property right that could, in turn, justify a restriction on the dissemination of tribal information. Federal patent law, for example, permits one who has developed a particular process to establish a property right in that process; the patentee, however, must publicly disclose the process in exchange for an exclusive, temporary right to use it. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 149 (1989).[9] State law protections on trade secrets permit one who has developed a formula or process to prevent those privy to information concerning the formula or process (such as employees) from disclosing it. For knowledge to be considered a trade secret under existing law, it must ordinarily have independent economic value by virtue of being kept secret and must be the subject of reasonable efforts to maintain its secrecy. *See* Restatement (First) of Torts § 757 cmt. b (1939). Matters of public or general knowledge cannot qualify as trade secrets. *Id.* To the extent that information on uses of biological resources has been shared with those outside of a tribe, trade secret protection would likely be unavailable to the tribe. It is unclear whether information held within a tribe, but widely known among tribal members, could qualify as a trade secret, analogous to information held within a corporation.

## Conclusion

As this discussion suggests, it is difficult to determine in the abstract whether a tribe could prevent its members from sharing knowledge concerning possible commercial uses of biological resources with persons outside the tribe. The task of deciding whether the ICRA limits a tribe's ability to prevent its members from disseminating information will fall primarily to tribal courts. It is therefore difficult to predict whether conventional free speech principles will guide the inquiry; in our view, the better reading of the ICRA is that such principles should apply. If conventional free speech principles do apply, then the legality of a tribal ordinance restricting the dissemination of information would depend in large part on

---

[9] In addition, to merit federal patent protection, a process must (among other things) be novel and nonobvious, *see* 35 U.S.C. § 103 (Supp. 1 1995), and must not have been "known or used by others in this country," 35 U.S C. § 102(a) (1994) To the extent that tribal members and others have, over time, known of or implemented a particular process, patent protection for the tribe probably would be unavailable

whether, under the ICRA, the relationship between tribes and their members should be thought of as analogous to the relationship between a government and its citizens. What is more, the analysis would turn on particular factual circumstances likely to vary from tribe to tribe. In particular, the analysis could turn on who holds the information that the tribe seeks to protect; whether those who hold the information have a particular relationship of trust with the tribe; the magnitude of the tribal interest underlying the tribe's effort not to disclose the information; and whether the information in question can be viewed as tribal property under an intellectual property regime that is otherwise consistent with applicable law.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*